1  LAWYERS FOR CLEAN WATER, INC.
2  Layne Friedrich (Bar No.  195431)
         Email:  layne@lawyersforcleanwater.com
3  Drevet Hunt (Bar No. 240487)
         Email: drev@lawyersforcleanwater.com
4  1004-A O'Reilly Avenue
5  San Francisco, California 94129
   Telephone:  (415) 440-6520
6  Facsimile:  (415) 440-4155
7
8  *Attorneys for Plaintiff*
   CALIFORNIA SPORTFISHING PROTECTION ALLIANCE
9
10
11              **UNITED STATES DISTRICT COURT**
                **EASTERN DISTRICT OF CALIFORNIA**
12

| 13  CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a California non-profit corporation, | Civil Case No. |
|---|---|
| 14 | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| 15               Plaintiff, | |
| 16        vs. | |
| 17 | |
| 18  PICK-N-PULL AUTO DISMANTLERS, a California general partnership; NORPROP, INC., a California corporation; PICK AND PULL AUTO DISMANTLING, INC., a California corporation; SCHNITZER STEEL INDUSTRIES, INC., an Oregon corporation; | **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23               Defendants. | |

24
25
26
27
28

Complaint

California Sportfishing Protection Alliance ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.    On March 21, 2014, CSPA sent a sixty (60) day notice of intent to sue ("Notice Letter") to Pick-N-Pull Auto Dismantlers; Norprop, Inc.; Pick and Pull Auto Dismantling, Inc.; and Schnitzer Steel Industries, Inc. (collectively "Defendants"). The Notice Letter informed Defendants of their violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ*) (hereinafter "Storm Water Permit") and the Clean Water Act. The Notice Letter also informed Defendants of CSPA's intent to file suit against them to enforce the Storm Water Permit and the Clean Water Act.

3.    The Notice Letter was sent to the registered agents for Defendants, the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1). The Notice Letter is attached hereto as Exhibit 1 and is incorporated herein by reference.

4.    More than sixty (60) days have passed since the Notice Letter was served on Defendants and the state and federal agencies. Plaintiff is informed and believes, and

1   thereon alleges, that neither EPA nor the State of California has commenced or is

2   diligently prosecuting an action to redress the violations alleged in this Complaint. *See* 33

3   U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty

4   under Section 309(g) of the Clean Water Act, 33 U.S.C. § 1319(g).

5        5.    Venue is proper in the Eastern District of California pursuant to Section

6   505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the sources of the

7   violations are located within this judicial district.

8        6.    Defendants' violations of the procedural and substantive requirements of the

9   Storm Water Permit and the Clean Water Act alleged in this Complaint are ongoing and

10  continuous.

11  **II.    <u>INTRODUCTION</u>**

12       7.    This Complaint seeks relief for Defendants' substantive and procedural

13  violations of the Storm Water Permit and the Clean Water Act resulting from

14  Defendants' operations at 7590 Stockton Boulevard, in Sacramento, California 95823

15  ("PNP Sacramento Facility" or "Facility"), including Defendants' discharges of polluted

16  storm water from the Facility.[1]

17       8.    With every storm event, hundreds of millions of gallons of polluted

18  rainwater, originating from industrial operations such as the PNP Sacramento Facility,

19  pour into Sacramento County area waters. The consensus among water quality agencies

20  and specialists is that storm water pollution accounts for more than half of the total

21  pollution entering marine and river environments each year. Sacramento County area

22  waters are ecologically sensitive areas and are essential habitat for dozens of fish and bird

23  species as well as macro-invertebrate and invertebrate species. Storm water contaminated

24  with sediment, heavy metals, and other pollutants harm the special aesthetic and

25  recreational significance that Sacramento County area waters have for people in the

26  surrounding communities. The public's use of Sacramento County area waters for water

27

28  [1] The PNP Sacramento Facility is described in detail in the Notice Letter attached as
    Exhibit 1.

Complaint               3

contact sports exposes many people to toxic metals and other contaminants in storm water. Non-contact recreation and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges into Sacramento area waters.

**III.   PARTIES**

      **A.   California Sportfishing Protection Alliance.**

      9.   Founded in 1983, CSPA is a non-profit public benefit conservation and research organization formed under section 501(c)(3) of the Internal Revenue Code, and located at 3536 Rainier Avenue, Stockton, California 95204.

      10.   CSPA's mission is to conserve, restore, and enhance the state's water quality, wildlife, fishery resources, aquatic ecosystems, and associated riparian habitats.

      11.   To further this mission, CSPA actively seeks federal, state, and local agency implementation of environmental regulations and statutes and routinely participates in administrative, legislative, and judicial proceedings. When necessary, CSPA directly initiates enforcement actions on behalf of itself and its members.

      12.   Defendants' discharge polluted storm water into Elder Creek, which flows into Morrison Creek, then to the Stone Lake National Wildlife Refuge, which discharges to the Sacramento-San Joaquin River Delta (collectively "the Receiving Waters").

      13.   CSPA has approximately 2,000 members who live, use, enjoy, and/or recreate in and around the Receiving Waters. CSPA's members use and enjoy the Receiving Waters for fishing, boating, swimming, diving, bird watching, picnicking, viewing wildlife, sailing, kayaking, hiking, engaging in scientific study, monitoring the watershed, and/or conducting watershed restoration.

      14.   Discharges of polluted storm water from the PNP Sacramento Facility degrade water quality, harm aquatic life in the Receiving Waters, and impair CSPA's members' use and enjoyment of the Receiving Waters.

      15.   Defendants' polluted discharges from the PNP Sacramento Facility are ongoing and continuous. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean

1  Water Act and the Storm Water Permit.

2  **B.    The PNP Sacramento Facility Owners and/or Operators.**

3       1.    <u>Pick and Pull Auto Dismantling, Inc.</u>

4      16.    CSPA is informed and believes, and thereon alleges, that Pick and Pull Auto

5  Dismantling, Inc. is a corporation formed under the laws of the State of California.

6      17.    CSPA is informed and believes, and thereon alleges, that Pick and Pull Auto

7  Dismantling, Inc. is an owner of the PNP Sacramento Facility.

8      18.    CSPA is informed and believes, and thereon alleges, that Pick and Pull Auto

9  Dismantling, Inc. has owned the PNP Sacramento Facility since at least March 21, 2009.

10      19.    CSPA is informed and believes, and thereon alleges, that Pick and Pull Auto

11  Dismantling, Inc. is an operator of the PNP Sacramento Facility.

12      20.    CSPA is informed and believes, and thereon alleges, that Pick and Pull Auto

13  Dismantling, Inc. has operated the PNP Sacramento Facility since at least March 21,

14  2009.

15      21.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto

16  Dismantling, Inc. is one of the general partners of the Pick-N-Pull Auto Dismantlers

17  general partnership.

18      22.    CSPA is informed and believes, and thereon alleges, that the registered agent

19  for service of process for Pick and Pull Auto Dismantling, Inc. is CT Corporation System

20  at 818 W Seventh Street, Los Angeles, California 90017.

21      2.    <u>Schnitzer Steel Industries, Inc.</u>

22      23.    CSPA is informed and believes, and thereon alleges, that Schnitzer Steel

23  Industries, Inc. is a corporation formed under the laws of the State of Oregon, and

24  registered in the State of California.

25      24.    CSPA is informed and believes, and thereon alleges, that the PNP

26  Sacramento Facility is just one of approximately sixty-five (65) Pick and Pull locations

27  across the United States and Canada.

28      25.    CSPA is informed and believes, and thereon alleges, that all of the Pick and

Complaint            5

1    Pull locations were acquired by Schnitzer Steel Industries, Inc. in or around 2003, and

2    Pick and Pull Auto Dismantling, Inc. became a fully owned subsidiary of Schnitzer Steel

3    Industries, Inc.'s "Auto Parts Business unit."

4         26.    CSPA is informed and believes, and thereon alleges, that Schnitzer Steel

5    Industries, Inc. is an owner of the PNP Sacramento Facility.

6         27.    CSPA is informed and believes, and thereon alleges, that Schnitzer Steel

7    Industries, Inc. has owned the PNP Sacramento Facility since at least March 21, 2009.

8         28.    CSPA is informed and believes, and thereon alleges, that Schnitzer Steel

9    Industries, Inc. is an operator of the PNP Sacramento Facility.

10        29.    CSPA is informed and believes, and thereon alleges, that Schnitzer Steel

11   Industries, Inc. has operated the PNP Sacramento Facility since at least March 21, 2009.

12        30.    CSPA is informed and believes, and thereon alleges, that the registered agent

13   for service of process for Schnitzer Steel Industries, Inc. is CT Corporation System,

14   located at 818 W Seventh Street, Los Angeles, California 90017.

15              3.   Norprop, Inc.

16        31.    CSPA is informed and believes, and thereon alleges, that Norprop, Inc. is a

17   corporation formed under the laws of the State of Oregon, and registered in the State of

18   California.

19        32.    CSPA is informed and believes, and thereon alleges that Norprop Inc. is a

20   wholly owned subsidiary of Schnitzer Steel Industries, Inc.

21        33.    CSPA is informed and believes, and thereon alleges, that Norprop, Inc. is an

22   owner of the PNP Sacramento Facility.

23        34.    CSPA is informed and believes, and thereon alleges, that Norprop, Inc. has

24   owned the PNP Sacramento Facility since at least March 21, 2009.

25        35.    CSPA is informed and believes, and thereon alleges, that Norprop, Inc. is an

26   operator of the PNP Sacramento Facility.

27        36.    CSPA is informed and believes, and thereon alleges, that Norprop, Inc. has

28   operated the PNP Sacramento Facility since at least March 21, 2009.

37.    CSPA is informed and believes, and thereon alleges, that Norprop, Inc. is one of the general partners of the Pick-N-Pull Auto Dismantlers general partnership.

38.    CSPA is informed and believes, and thereon alleges, that the registered agent for service of process for Norprop, Inc. is CT Corporation System at 818 W Seventh Street, Los Angeles, California 90017.

4.    Pick-N-Pull Auto Dismantlers

39.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto Dismantlers is a general partnership registered in the State of California.

40.    All Annual Reports submitted to the Regional Board for the PNP Sacramento Facility since at least March 21, 2009 list the PNP Sacramento Facility name as "Pick-N-Pull Auto Dismantlers."

41.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto Dismantlers is an owner of the PNP Sacramento Facility.

42.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto Dismantlers has owned the PNP Sacramento Facility since at least March 21, 2009.

43.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto Dismantlers is an operator of the PNP Sacramento Facility.

44.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto Dismantlers has operated the PNP Sacramento Facility since at least March 21, 2009.

45.    CSPA refers to Pick-N-Pull Auto Dismantlers; Norprop, Inc.; Pick and Pull Auto Dismantling, Inc.; and Schnitzer Steel Industries, Inc. collectively as the "PNP Sacramento Facility Owners and/or Operators."

IV.    **LEGAL BACKGROUND**

A.    **The Clean Water Act and California's Storm Water Permit.**

46.    Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1311(a).

47.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

48.     Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a single, statewide, general NPDES permit applicable to all industrial storm water dischargers. *See id.*

49.     California is a state authorized by the EPA to issue NPDES permits.

50.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act. *See* Storm Water Permit, Finding No. 15.

51.     In order to discharge storm water lawfully in California, industrial storm water dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit.

52.     Violations of the Storm Water Permit are violations of the Clean Water Act. *See* Storm Water Permit, Section C(1) (Standard Provisions).

53.     Waters of the United States include traditionally navigable waters, tributaries to traditionally navigable waters, wetlands, and wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. *See Rapanos v. U.S.,* 126 S. Ct. 2208 (2006).

54.     The Clean Water Act also confers jurisdiction over waters that have a significant nexus to the navigable water. *Rapanos,* 126 S. Ct. at 2248-49. A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Id.* at 2248.

55.     A significant nexus is also established for waters that have flood control

properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Id.* at 2250.

56.     Each of the Receiving Waters is a "water of the United States" within the meaning of Section 502(7) of the Clean Water Act. *See* 33 U.S.C. § 1362(7) and 33 C.F.R. § 328.3(a).

57.     Section 505(a)(1) of the Clean Water Act provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

58.     Pick-N-Pull Auto Dismantlers is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

59.     Norprop, Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

60.     Pick and Pull Auto Dismantling, Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

61.     Schnitzer Steel Industries, Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

62.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

63.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

64.     Section 505(d) of the Clean Water Act allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. *See* 33 U.S.C. § 1365(d).

**B.     Effluent Limitation B(3) of the Storm Water Permit.**

65.     Effluent Limitation B(3) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activities in storm water discharges

1  through the implementation of Best Available Technology Economically Achievable

2  ("BAT") for toxic or non-conventional pollutants and Best Conventional Pollutant

3  Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40

4  C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional

5  pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand

6  ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal

7  coliform, among others.

8       66.    In states not delegated to implement the Clean Water Act, EPA regulates

9  industrial storm water pollution with the *NPDES Multi-Sector General Permit for

10 Stormwater Discharges Associated With Industrial Activity* ("MSGP"), which includes

11 numeric benchmarks for pollutant concentrations in storm water discharges ("Benchmark

12 Levels").

13      67.    The Benchmark Levels provide an objective standard to determine whether a

14 facility's Best Management Practices ("BMPs") are successfully developed and/or

15 implemented. *See* MSGP Fact Sheet, at 95 (2008), *available at*

16 http://www.epa.gov/npdes/pubs/msgp2008_finalfs.pdf.

17      68.    Discharges from an industrial facility containing pollutant concentrations

18 that exceed Benchmark Levels indicate that the facility has not developed and/or

19 implemented BMPs that meet BAT for toxic pollutants and/or BCT for conventional

20 pollutants. *Id.*

21      **C.    Receiving Water Limitations C(1) and C(2) of the Storm Water Permit.**

22      69.    Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm

23 water discharges that adversely impact human health or the environment.

24      70.    Discharges with pollutant levels that exceed levels known to adversely

25 impact aquatic species and the environment are violations of Receiving Water Limitation

26 C(1) of the Storm Water Permit.

27      71.    Receiving Water Limitation C(2) of the Storm Water Permit prohibits storm

28 water discharges that "cause or contribute to an exceedance of any applicable water

Complaint                                    10

quality standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

72.    Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and/or the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

73.    WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the *Water Quality Control Plan for the Sacramento River and San Joaquin River Basins*, California Regional Water Quality Control Board, Central Valley Region (4th Ed., revised Oct. 2011) ("Basin Plan"), and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

74.    The CTR includes numeric criteria set to protect human health and the environment in the State of California.[2]

75.    The Basin Plan identifies the "Beneficial Uses" of water bodies in the Sacramento area.

76.    The Beneficial Uses for the Receiving Waters, which receive polluted storm water discharges from the PNP Sacramento Facility, collectively include agriculture supply (AGR), municipal and domestic supply (MUN), water contact recreation (REC 1), non-contact water recreation (REC 2), cold freshwater habitat (COLD), warm freshwater habitat (WARM), estuarine habitat (EST), wildlife habitat (WILD), rare, threatened, or endangered species (RARE), migration of aquatic organisms (MIGR), and spawning, reproduction, and development (SPWN). *See* Basin Plan at II-1.00 – II-8.00.

77.    A surface water that cannot support a listed Beneficial Use is designated as an impaired water body pursuant to Section 303(d) of the Clean Water Act. *See* 33 U.S.C. § 1313(d).

78.    A discharge of a pollutant at a level above an applicable WQS, such as the

---

[2] Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008, April 2000 *available at*: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

1    CTR, causes and/or contributes to the impairment of the Beneficial Uses of the waters

2    receiving the discharges.

3        79.    Elder Creek is impaired by chlorpyrifos, diazinon, pyrethroids, and sediment

4    toxicity.[3]

5        80.    Elder Creek is a major tributary to Morrison Creek. Elder Creek provides

6    flood control and flood management. Elder Creek also provides hydrological transport of

7    materials, including water and any dissolved or suspended pollutants, sediment, and

8    organic matter to downstream waters, and provides habitat for riparian species and

9    aquatic dependent organisms.

10       81.    Elder Creek affects the physical, chemical, and biological integrity of

11   downstream waters, including the Sacramento-San Joaquin Delta.

12       82.    Morrison Creek is impaired by diazinon, PCPs, pyrethroids, and sediemtn

13   toxicity.

14       83.    The Sacramento-San Joaquin Delta is impaired by mercury and unknown

15   toxicity.

16       84.    Discharges with pollutant levels in excess of the CTR criteria, the Basin

17   Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of

18   the Storm Water Permit.

19       **D.    The Storm Water Permit's Storm Water Pollution Prevention Plan**
20           **Requirements.**

21       85.    Section A(1) and Provision E(2) of the Storm Water Permit require

22   dischargers to develop and implement a Storm Water Pollution Prevention Plan

23   ("SWPPP") that complies with the requirements of the Storm Water Permit prior to

24   commencing industrial activities.

25       86.    The objectives of the SWPPP are to identify and evaluate sources of

26   pollutants associated with industrial activities that may affect the quality of storm water

27   [3] 2010 Integrated Report – All Assessed Waters, available at:
28   http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml (last
     accessed on May 14, 2014).

Complaint                                        12

discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section A(2).

87. Section A(3) of the Storm Water Permit requires a discharger to identify the members of its on-site Storm Water Pollution Prevention Team and to indicate each team member's responsibilities in developing, implementing, and revising the SWPPP as to ensure compliance with the Storm Water Permit.

88. Section A(4) of the Storm Water Permit requires that the SWPPP include a site map that contains, among other requirements: the facility boundaries, storm water drainage areas and directions of flow for each drainage area, on-site surface water bodies, nearby water bodies, areas of soil erosion, and municipal storm drain inlets where the facility's storm water discharges may be received (Section A(4)(a)); the location of the storm water collection, conveyance, and discharge system and structural control measures that affect storm water discharges (Section A(4)(b)); an outline of all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures (Section (4)(c)); locations where materials are directly exposed to precipitation and where significant spills or leaks have occurred (Section A(4)(d)); and areas of industrial activity, including areas that are actual and potential pollutant sources (Section A(4)(e)).

89. Section A(5) of the Storm Water Permit requires that the SWPPP include a list of significant materials handled and stored at the site.

90. Section A(6)(a) of the Storm Water Permit requires that the SWPPP include a narrative description of the facility's industrial activities, associated potential pollutant sources, and potential pollutants that could be discharged in storm water.

91. Section A(6)(b) of the Storm Water Permit requires that the SWPPP include a summary of all areas of industrial activities, potential pollutant sources, and potential pollutants.

92. Section A(7)(a) of the Storm Water Permit requires that the SWPPP include

a narrative assessment of all industrial activities and potential pollutant sources to determine which areas of the facility are likely sources of pollutants and which pollutants are likely to be present in the storm water discharges. Section A(7)(b) of the Storm Water Permit requires that the SWPPP include a summary of the areas of the facility that are likely sources of pollutants and the corresponding pollutants likely to be present in storm water discharges.

93.     Section A(8) of the Storm Water Permit requires that the SWPPP include a narrative description of the storm water BMPs to be implemented at the facility for each potential pollutant and its source. BMPs shall be developed and implemented to reduce or prevent pollutants in storm water discharges. *Id.* Dischargers must develop and implement structural and/or non-structural BMPs. *Id.*

94.     Section A(9) of the Storm Water Permit requires that the discharger evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit.

95.     Sections A(9)(a)-(c) of the Storm Water Permit require that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP.

96.     Section A(9)(d) of the Storm Water Permit requires that the discharger submit an evaluation report that includes identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and certification that the discharger is in compliance with the Storm Water Permit. If certification of compliance cannot be provided, the discharger must explain in

the evaluation report why the facility is not in compliance with the Storm Water Permit.
Storm Water Permit, Section A(9)(d). The evaluation report shall be submitted as part of
the Annual Report, which is specified in Section B(14) of the Storm Water Permit. Storm
Water Permit, Section B(14).

97.    Section A(10) of the Storm Water Permit requires that the discharger revise
the SWPPP as necessary prior to changes in industrial activities, or as otherwise required
by the Storm Water Permit.

**E.    The Storm Water Permit's Monitoring and Reporting Requirements.**

98.    Section B(1) and Provision E(3) of the Storm Water Permit require
dischargers to develop and implement a Monitoring and Reporting Program ("M&RP")
prior to commencing industrial activities.

99.    The objectives of the M&RP are to confirm that BMPs have been adequately
developed and implemented such that storm water and non-storm water discharges
comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and
Receiving Water Limitations. Storm Water Permit, Sections B(2)(a) and B(2)(b).

100.    The M&RP aids in the implementation and revision of the SWPPP and
measures the effectiveness of BMPs to prevent or reduce pollutants in storm water
discharges. Storm Water Permit, Sections B(2)(c) and B(2)(d).

101.    Section B(2)(d) of the Storm Water Permit requires that the M&RP "shall be
revised" as necessary to ensure compliance with the Storm Water Permit.

102.    Section B(3) of the Storm Water Permit requires a discharger to conduct
visual observations of all drainage areas within the facility for the presence of authorized
and unauthorized non-storm water discharges. Observations under this section must occur
during daylight hours, on days with no storm water discharges, and during scheduled
facility operating hours.

103.    Section B(4) of the Storm Water Permit requires a discharger to conduct
visual observations of storm water discharges during the first hour of discharge, at each
discharge point, of at least one storm event per month during the Wet Season (October 1

Complaint                                    15

1  – May 30). Observations under this section must take place during daylight hours, on
2  days when the discharge is preceded by at least three (3) days without storm water
3  discharges, and during scheduled facility operating hours.

4      104.   Visual observations conducted under Sections B(3) and B(4) of the Storm
5  Water Permit must be recorded. Records of observations must describe the presence of
6  any floating or suspended materials, O&G, discolorations, turbidity, odor, and the source
7  of any pollutants observed during the visual observation. Dischargers must maintain
8  records of visual observations that include the observation date, locations observed, and
9  responses taken to eliminate unauthorized non-storm water discharges and to reduce or
10  prevent pollutants from contacting non-storm water and storm water discharges.
11  Furthermore, Sections B(3) and B(4) require a discharger to revise a facility's SWPPP in
12  order to rectify any instances of noncompliance observed during visual observations.

13      105.   Sections B(5) and B(7) of the Storm Water Permit require dischargers to
14  visually observe and collect samples of storm water discharges from all locations where
15  storm water is discharged.

16      106.   Section B(5)(a) of the Storm Water Permit requires dischargers to collect
17  storm water samples during the first hour of discharge. Samples of storm water
18  discharges must be collected from the first storm event of the Wet Season and at least one
19  other storm event in the Wet Season. *Id.* All storm water discharge locations must be
20  sampled. *Id.*

21      107.   Facility operators that do not collect samples from the first storm event of
22  the Wet Season are still required to collect samples from two other storm events during
23  the Wet Season, and must explain in the Annual Report why the first storm event was not
24  sampled. *Id.*

25      108.   Section B(5)(b) requires that sampling conducted pursuant to the Storm
26  Water Permit occur during scheduled facility operating hours on days that are preceded
27  by at least three (3) working days without storm water discharge.

28      109.   Section B(5)(c)(i) of the Storm Water Permit requires dischargers to analyze

Complaint                                   16

each sample for pH, specific conductance ("SC"), TSS, and O&G. A discharger may substitute analysis for total organic carbon ("TOC") instead of O&G.

110.   Section B(5)(c)(ii) of the Storm Water Permit requires dischargers to analyze each storm water sample for toxic chemicals and other pollutants likely to be present in the storm water discharged from the facility in significant quantities.

111.   Section B(5)(c)(iii) and Table D of the Storm Water Permit require facilities classified as Sector M (Standard Industrial Classification ("SIC") Code 5015) to analyze storm water samples for iron, lead, and aluminum, and as otherwise required by the Regional Board.

112.   Section B(14) of the Storm Water Permit requires dischargers to submit an Annual Report to the applicable regional board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9) of the Storm Water Permit, an explanation of why a facility did not implement any required activities, and other records specified in Section B(13) of the Storm Water Permit.

113.   Section C(9) of the Storm Water Permit requires that all reports, certifications, or other information required by the Storm Water Permit or requested by a regional board to have been signed by an authorized representative of the facility's operators.

114.   Section C(11)(d) of the Storm Water Permit requires facility operators to report any incidence of noncompliance with the Storm Water Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance.

# V.    FACTUAL BACKGROUND

## A.    The PNP Sacramento Facility's Storm Water Permit Coverage.

115.   A Notice of Intent ("NOI") seeking Storm Water Permit coverage for the PNP Sacramento Facility was filed with the State Board on March 14, 1992.

116.   The NOI lists the SIC Code for the PNP Sacramento Facility as 5015 (Motor Vehicle Parts, Used).

117.   The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the Waste Discharge Identification ("WDID") number associated with the address of the PNP Sacramento Facility as 5S34I001815.

118.   SMARTS lists the facility name associated with WDID number 5S34I001815 as "Pick-N-Pull Auto Dismantlers."

119.   SMARTS lists the owner/operator associated with WDID number 5S34I001815 as "Pick-N-Pull."

120.   SMARTS lists the PNP Sacramento Facility, WDID 5S34I001815, as having "active" coverage under the Storm Water Permit.

121.   Correspondences to the Regional Board in regard to the PNP Sacramento Facility are sent by "Pick-N-Pull Auto Dismantlers" and list the Facility's assigned WDID number as 5S34I001815.

## B.    Industrial Activities at the PNP Sacramento Facility.

122.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility is approximately 15 acres in size.

123.   CSPA is informed and believes, and thereon alleges, that the following industrial activities are conducted at the PNP Sacramento Facility: automobile dismantling; automobile crushing; automobile parts storage and resale; used and salvaged automobile storage; scrap metal processing, storage, and sale; used battery collection, storage, and recycling; and vehicle and equipment maintenance and repair.

124.   CSPA is informed and believes, and thereon alleges, that the PNP

1    Sacramento Facility generates, handles, and stores hazardous wastes, including batteries,

2    hydraulic oil, waste oil, used antifreeze, and waste gasoline.

3        125.   CSPA is informed and believes, and thereon alleges, that industrial

4    operations at the Facility are sources of pollutants and include, but may not be limited to:

5    outdoor material handling and storage areas; automobile dismantling and crushing areas;

6    used and salvaged automobile and parts storage areas; scrap metal processing and storage

7    areas; used battery collection, storage, and recycling areas; vehicle and equipment

8    maintenance and/or cleaning activities and areas; hazardous waste storage areas; parking

9    areas; loading and unloading areas; areas with truck traffic and associated track-off of

10   pollutants; material processing areas; loose piles of scrap materials; waste dumpsters; and

11   on-site material handling equipment.

12       126.   CSPA is informed and believes, and thereon alleges, that the pollutants

13   associated with operations at the PNP Sacramento Facility include, but are not limited to:

14   pH-affecting substances; TSS; SC-affecting substances; sediment; dust and particulates;

15   petroleum hydrocarbons; coolant; used oil filters; waste antifreeze; used oil; sulfuric acid;

16   solvents; hydraulic fluids; diesel fuel; motor oil; and toxic metals such as mercury, zinc,

17   copper, iron, aluminum, and lead.

18       127.   CSPA is informed and believes, and thereon alleges, that industrial activities

19   at the PNP Sacramento Facility are conducted outdoors and without adequate cover or

20   other BMPs to prevent the exposure of industrial activities to rainfall.

21       128.   CSPA is informed and believes, and thereon alleges, that there is inadequate

22   secondary containment at the Facility, and inadequate measures to prevent polluted storm

23   water from discharging from the Facility.

24       129.   CSPA is informed and believes, and thereon alleges, that materials

25   associated with industrial activities are stored near driveways and other discharge points

26   at the PNP Sacramento Facility.

27       130.   CSPA is informed and believes, and thereon alleges, that O&G, trash,

28   debris, and other pollutants, including heavy metals, have been and continue to be tracked

Complaint                                    19

1  throughout the PNP Sacramento Facility.

2      131.   CSPA is informed and believes, and thereon alleges, that pollutants

3  accumulate at outdoor material handling and storage areas; material processing areas;

4  vehicle and equipment maintenance, storage, and cleaning areas; hazardous waste storage

5  areas; parking lots and driveways leading to Stockton Boulevard; loading and unloading

6  areas; dumpsters; and the surrounding municipal streets themselves.

7      132.   CSPA is informed and believes, and thereon alleges, that trucks and vehicles

8  coming into and leaving the PNP Sacramento Facility via staging areas and driveways are

9  pollutant sources tracking sediment, dirt and dust, O&G, and other pollutants off-site.

10      133.   CSPA is informed and believes, and thereon alleges, that the PNP

11  Sacramento Facility Owners and/or Operators have failed to adequately develop and/or

12  implement BMPs to prevent the exposure of pollutants and their sources to storm water

13  flows at the PNP Sacramento Facility, in violation of the Storm Water Permit and the

14  Clean Water Act.

15      134.   CSPA is informed and believes, and thereon alleges, that the PNP

16  Sacramento Facility Owners and/or Operators have failed to adequately develop and/or

17  implement BMPs sufficient to reduce or prevent pollutants in storm water discharged

18  from the PNP Sacramento Facility, as required by the Storm Water Permit and the Clean

19  Water Act.

20      135.   The failure to properly develop and implement BMPs for pollutants and their

21  sources results in the discharge of pollutants from the PNP Sacramento Facility in

22  violation of the Storm Water Permit and the Clean Water Act.

23      **C.      Storm Water Discharges at the PNP Sacramento Facility.**

24      136.   CSPA is informed and believes, and thereon alleges, that there are at least

25  four (4) discharge points at the PNP Sacramento Facility. CSPA refers to these discharge

26  points as Discharge Points #1 – 4.

27      137.   CSPA is informed and believes, and thereon alleges, that Discharge Point #1

28  receives storm water flows from the entire Facility, including from the car crushing area,

areas where fluid draining activities occur, automobile dismantling areas, used and wrecked car storage areas, waste material storage areas, and areas throughout the Facility where pollutants accumulate.

138.   CSPA is informed and believes, and thereon alleges, that Discharge Point #1 collects storm water flows via numerous drain inlets located throughout the Facility, which are collected and discharged to the municipal storm drain system at Stockton Boulevard.

139.   CSPA is informed and believes, and thereon alleges, that Discharge Point #2 receives storm water flows from the northeastern portion of the Facility.

140.   CSPA is informed and believes, and thereon alleges, that storm water discharges from the PNP Sacramento Facility via a driveway at the northeastern corner of the Facility leading onto Stockton Boulevard (Discharge Point #2).

141.   CSPA is informed and believes, and thereon alleges, that Discharge Point #3 receives storm water flows from the eastern portion of the Facility.

142.   CSPA is informed and believes, and thereon alleges, that storm water discharges from the PNP Sacramento Facility via a driveway in the middle of the eastern border of the Facility that leads to Stockton Boulevard (Discharge Point #3).

143.   CSPA is informed and believes, and thereon alleges, that Discharge Point #4 receives storm water flows from the southeast corner of the Facility.

144.   CSPA is informed and believes, and thereon alleges, that storm water discharges from the PNP Sacramento Facility via a driveway in the southeast corner of the Facility that leads to Stockton Boulevard (Discharge Point #4).

145.   CSPA is informed and believes, and thereon alleges, that Discharge Points #1 – 4 flow to the Receiving Waters.

**D.    The Storm Water Discharges at the PNP Sacramento Facility Contain Elevated Levels of Pollutants.**

146.   Samples of storm water discharges collected at the PNP Sacramento Facility contain levels of pollutants in excess of Benchmark Levels. *See* Exhibit 1 at § II.A and

Exhibit A (table attached to Notice Letter identifying specific storm water samples with electrical conductivity, lead, copper, zinc, cadmium, TSS, and pH concentrations above Benchmark Levels).

147.   CSPA is informed and believes, and thereon alleges, that repeated exceedances of Benchmark Levels demonstrate that Defendants failed and continue to fail to develop and/or implement BMPs at the Facility that achieve compliance with BAT/BCT standards.

148.   CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur each time storm water discharges from the PNP Sacramento Facility.

149.   Samples of storm water discharges collected at the PNP Sacramento Facility contain levels of pollutants in excess of WQS. *See* Exhibit 1 at § II.B and Exhibit A (table attached to Notice Letter identifying specific storm water samples with lead, copper, zinc, cadmium, and pH concentrations above WQS).

150.   Samples of storm water discharges collected at the PNP Sacramento Facility contain concentrations of pollutants at levels known to adversely impact aquatic species and the environment. *See* Exhibit 1 at § II.B.

**E.     Defendants' Failure to Comply with the Storm Water Permit's SWPPP Requirements.**

151.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners and/or Operators failed and continue to fail to develop a SWPPP for the PNP Sacramento Facility that complies with Section A of the Storm Water Permit.

152.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners and/or Operators failed and continue to fail to implement a SWPPP for the PNP Sacramento Facility that complies with Section A of the Storm Water Permit.

153.   CSPA is informed and believes, and thereon alleges, that the PNP

Complaint                              22

Sacramento Facility Owners and/or Operators failed and continue to fail to revise the SWPPP for the PNP Sacramento Facility as necessary to ensure compliance with the Storm Water Permit.

154.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility SWPPP does not include, among other things, an adequate description of the Facility's potential pollutant sources and potential pollutants that could be discharged in storm water, as required by Section A(6) of the Storm Water Permit.

155.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility SWPPP does not include, among other things, the required analysis and evaluation to determine what areas of the Facility are likely sources of pollutants and the corresponding pollutants likely to be present in storm water discharges, as required by Section A(7) of the Storm Water Permit.

156.   The PNP Sacramento Facility SWPPP does not include adequate BMPs to reduce or prevent pollutants in storm water discharges to levels required by the Storm Water Permit.

### F.   Defendants' Failure to Comply with the Storm Water Permit's M&RP Requirements.

157.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners and/or Operators failed and continue to fail to develop an adequate M&RP for industrial operations at the PNP Sacramento Facility that complies with Section B of the Storm Water Permit.

158.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners and/or Operators failed and continue to fail to implement an adequate M&RP for industrial operations at the PNP Sacramento Facility that complies with Section B of the Storm Water Permit.

159.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners and/or Operators failed and continue to fail to revise the M&RP for the PNP Sacramento Facility as necessary to ensure compliance with the

1   Storm Water Permit.

2          160.   CSPA is informed and believes, and thereon alleges, that the PNP

3   Sacramento Facility Owners and/or Operators fail to observe authorized non-storm water

4   discharges in the manner required by Section B(3) of the Storm Water Permit.

5          161.   CSPA is informed and believes, and thereon alleges, that the PNP

6   Sacramento Facility Owners and/or Operators fail to observe unauthorized non-storm

7   water discharges in the manner required by Section B(3) of the Storm Water Permit.

8          162.   CSPA is informed and believes, and thereon alleges, that the PNP

9   Sacramento Facility Owners and/or Operators fail to document any responses to

10  pollutants observed in the Facility's storm water discharges that will reduce or prevent

11  these pollutants, as required by Section B(4) of the Storm Water Permit.

12         163.   CPSA is informed and believes, and thereon alleges, that the PNP

13  Sacramento Facility Owners and/or Operators fail to collect two storm water samples

14  during the first hour of discharge every Wet Season, as required by Section B(5) of the

15  Storm Water Permit.

16         164.   CSPA is informed and believes, and thereon alleges, that the PNP

17  Sacramento Facility Owners and/or Operators fail to collect storm water samples from all

18  discharge locations at the PNP Sacramento Facility during every Wet Season, as required

19  by Section B(5) of the Storm Water Permit.

20         165.   CSPA is informed and believes, and thereon alleges, that the PNP

21  Sacramento Facility Owners and/or Operators fail to analyze all storm water samples for

22  all pollutants required by Section B(5) and Table D of the Storm Water Permit for

23  facilities classified as SIC Code 5015.

24         166.   CSPA is informed and believes, and thereon alleges, that the PNP

25  Sacramento Facility Owners and/or Operators fail to analyze storm water samples for all

26  pollutants likely to be present in the Facility's discharges in significant quantities, as

27  required by Section B(5) of the Storm Water Permit.

28  / / /

**G.    Defendants' Failure to Comply with the Storm Water Permit's Reporting Requirements.**

167.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners and/or Operators fail to submit complete and adequate Annual Reports that comply with Section B(14) of the Storm Water Permit.

168.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners and/or Operators failed to include a summary or evaluation of their visual observations and sampling results in every Annual Report submitted for the Facility in at least the last five (5) years.

169.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners and/or Operators failed to explain their noncompliance with the Storm Water Permit in every Annual Report submitted for the Facility in at least the last five (5) years.

170.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners and/or Operators fail to include an evaluation report that explains necessary SWPPP revisions and a schedule for implementing the SWPPP revisions in Annual Reports.

171.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners' and/or Operators' certifications of compliance with the Storm Water Permit in each of the Facility's past five (5) Annual Reports are erroneous because the PNP Sacramento Facility Owners and/or Operators have not developed and/or implemented the BMPs required by the Storm Water Permit.

172.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners' and/or Operators' Annual Reports inaccurately state that the BMPs set out in the Facility's SWPPP address existing potential pollutant sources when they do not.

173.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners' and/or Operators' Annual Reports falsely state that the

Facility's SWPPP is up to date when it is not.

174.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners' and/or Operators' certifications of compliance with the Storm Water Permit in each of their past five (5) Annual Reports are erroneous because the PNP Sacramento Facility Owners and/or Operators have not revised the Facility's SWPPP to address all Storm Water Permit violations.

175.   CSPA is informed and believes, and thereon alleges, that the PNP Sacramento Facility Owners' and/or Operators' certifications of compliance with the Storm Water Permit in each of their past five (5) Annual Reports are erroneous because the PNP Sacramento Facility Owners and/or Operators have not revised the Facility's M&RP to address all Storm Water Permit violations.

# VI.   CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
**Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitation B(3) and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

176.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

177.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent levels of pollutants in the Facility's storm water discharges through development and implementation of BAT/BCT.

178.   CSPA is informed and believes, and thereon alleges, that Defendant's violations of Effluent Limitation B(3) of the Storm Water Permit and the Clean Water Act occur each time storm water is discharged from the Facility.

179.   CSPA is informed and believes, and thereon alleges, that Defendants' violations of Effluent Limitation B(3) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

180.   Defendants will continue to be in violation of the Storm Water Permit and

the Clean Water Act each and every time contaminated storm water discharges from the PNP Sacramento Facility in violation of Effluent Limitation B(3) of the Storm Water Permit.

181.   Each and every time Defendants discharge storm water from the PNP Sacramento Facility in violation of Effluent Limitation B(3) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

182.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since March 21, 2009.

183.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

### Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitation C(1) and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

184.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

185.   CSPA is informed and believes, and thereon alleges, that Defendants have discharged and continue to discharge storm water from the Facility containing levels of pollutants that adversely impact human health and/or the environment.

186.   CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the

environment from the PNP Sacramento Facility occur each time storm water discharges from the PNP Sacramento Facility.

187.   CSPA is informed and believes, and thereon alleges, that Defendants violate Receiving Water Limitation C(1) of the Storm Water Permit each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment discharges from the PNP Sacramento Facility.

188.   CSPA is informed and believes, and thereon alleges, that Defendants' violations of Receiving Water Limitation C(1) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

189.   Defendants will continue to be in violation of the Storm Water Permit and the CWA each and every time contaminated storm water discharges from the PNP Sacramento Facility in violation of Receiving Water Limitation C(1) of the Storm Water Permit.

190.   Each and every violation of Receiving Water Limitation C(1) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

191.   Pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since March 21, 2009.

192.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

/ / /

/ / /

**THIRD CAUSE OF ACTION**

**Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitation C(2) and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

193.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

194.   CSPA is informed and believes, and thereon alleges, that Defendants have discharged and continue to discharge storm water from the Facility containing levels of pollutants that cause or contribute to exceedances of water quality standards.

195.   CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards occur each time storm water discharges from the PNP Sacramento Facility.

196.   Defendants violate Receiving Water Limitation C(2) of the Storm Water Permit each and every time storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards discharges from the PNP Sacramento Facility.

197.   CSPA is informed and believes, and thereon alleges, that Defendants' violations of Receiving Water Limitation C(2) of the Storm Water Permit and Clean Water Act are ongoing and continuous.

198.   Each and every violation of Receiving Water Limitation C(2) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

199.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since March 21, 2009.

200.   An action for injunctive relief under the Clean Water Act is authorized by 33

U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit and Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

201.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

202.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately develop a SWPPP for the PNP Sacramento Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

203.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately implement a SWPPP for the PNP Sacramento Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

204.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise a SWPPP for the PNP Sacramento Facility, in violation of Sections A(9) and A(10) of the Storm Water Permit.

205.   Defendants have been in violation of Section A and Provision E(2) of the Storm Water Permit for failing to develop, implement, and/or revise an adequate SWPPP for the PNP Sacramento Facility every day since at least March 21, 2009.

206.   Defendants' violations of Section A and Provision E(2) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

207.   Defendants will continue to be in violation of Section A and Provision E(2) of the Storm Water Permit and the Clean Water Act each and every day Defendants fail to adequately develop, implement, and/or revise the SWPPP for the PNP Sacramento

1  Facility.

2  208.   Each and every violation of the Storm Water Permit's SWPPP requirements

3  at the PNP Sacramento Facility is a separate and distinct violation of the Clean Water

4  Act.

5  209.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§

6  1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged

7  above, Defendants are subject to an assessment of civil penalties for each and every

8  violation of the Clean Water Act since March 21, 2009.

9  210.   An action for injunctive relief under the Clean Water Act is authorized by 33

10  U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

11  irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or

12  adequate remedy at law.

13  WHEREFORE, CSPA prays for judgment against Defendants as set forth

14  hereafter.

15  ## FIFTH CAUSE OF ACTION

16  **Defendants' Failure to Adequately Develop, Implement, and/or Revise a**
17  **Monitoring and Reporting Program in Violation of the Storm Water Permit and**
**Clean Water Act.**

18  ### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

19  211.   CSPA incorporates the allegations contained in the above paragraphs as
20  though fully set forth herein.

21  212.   CSPA is informed and believes, and thereon alleges, that Defendants failed
22  and continue to fail to adequately develop an M&RP for the PNP Sacramento Facility, in
23  violation of Section B and Provision E(3) of the Storm Water Permit.

24  213.   CSPA is informed and believes, and thereon alleges, that Defendants failed
25  and continue to fail to adequately implement an M&RP for the PNP Sacramento Facility,
26  in violation of Section B and Provision E(3) of the Storm Water Permit.

27  214.   CSPA is informed and believes, and thereon alleges, that Defendants failed
28  and continue to fail to adequately revise an M&RP for the PNP Sacramento Facility, in

violation of Section B and Provision E(3) of the Storm Water Permit.

215.   Defendants have been in violation of Section B and Provision E(3) of the Storm Water Permit for their failure to develop, implement, and/or revise an adequate M&RP for the PNP Sacramento Facility every day since at least March 21, 2009.

216.   Defendants' violations of Section B and Provision E(3) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

217.   Defendants will continue to be in violation of Section B and Provision E(3) the Storm Water Permit and the Clean Water Act each and every day Defendants fail to adequately develop, implement, and/or revise an M&RP for the PNP Sacramento Facility.

218.   Each and every violation of the Storm Water Permit's M&RP requirements at the PNP Sacramento Facility is a separate and distinct violation of the Clean Water Act.

219.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since March 21, 2009.

220.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

## SIXTH CAUSE OF ACTION
**Defendants' Failure to Comply With the Reporting Requirements in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

221.   CSPA incorporates the allegations contained in the above paragraphs as

1 though fully set forth herein.

2     222. CSPA is informed and believes, and thereon alleges, that Defendants'

3 Annual Reports have not met the reporting requirements of the Storm Water Permit, in

4 violation of Section B(14) of the Storm Water Permit.

5     223. CSPA is informed and believes, and thereon alleges, that Defendants'

6 Annual Reports are inaccurate, in violation of Sections A(9) and B(14) of the Storm

7 Water Permit.

8     224. CSPA is informed and believes, and thereon alleges, that Defendants'

9 Annual Reports are incomplete, in violation of Sections A(9) and B(14) of the Storm

10 Water Permit.

11     225. Defendants have been in violation of the reporting requirements of the Storm

12 Water Permit each day they have operated the PNP Sacramento Facility without reporting

13 as required by Sections A(9) and B(14) of the Storm Water Permit.

14     226. Defendants have been in daily and continuous violation of Sections A(9) and

15 B(14) of the Storm Water Permit every day since at least March 21, 2009.

16     227. Defendants' violations of the reporting requirements of the Storm Water

17 Permit and the CWA are ongoing and continuous.

18     228. Pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d),

19 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above,

20 Defendants are subject to an assessment of civil penalties for each and every violation of

21 the CWA since March 21, 2009.

22     229. An action for injunctive relief under the Clean Water Act is authorized by 33

23 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

24 irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or

25 adequate remedy at law.

26     WHEREFORE, CSPA prays for judgment against Defendants as set forth

27 hereafter.

28 / / /

1

## VII.   RELIEF REQUESTED

2       230.   CSPA respectfully requests that this Court grant the following relief:

3             a.       A Court order declaring Defendants to have violated and to be in

4   violation of the Storm Water Permit and Section 301(a) of the CWA, 33 U.S.C. §

5   1311(a), for their violations of the substantive and procedural requirements of the Storm

6   Water Permit;

7             b.       A Court order enjoining Defendants from violating the substantive

8   and procedural requirements of the Storm Water Permit and the Clean Water Act;

9             c.       A Court order assessing civil monetary penalties for each violation of

10   the Clean Water Act at $37,500 per day per violation for violations occurring since

11   March 21, 2009, as permitted by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4;

12             d.       A Court order awarding CSPA its reasonable costs of this suit,

13   including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of

14   the Clean Water Act, 33 U.S.C. § 1365(d);

15             e.       Any other relief as this Court may deem appropriate.

16

17   Dated: May 21, 2014                              Respectfully submitted,

18                                                    LAWYERS FOR CLEAN WATER, INC.

19

20

21                                                    _____

22                                                    Layne Friedrich
                                                      Drevet Hunt
23                                                    Attorneys for Plaintiff
                                                      California Sportfishing Protection Alliance
24

25

26

27

28