1  Layne Friedrich (Bar No. 195431)
     Layne@lawyersforcleanwater.com
2  Drevet Hunt (Bar No. 240487)
     Drev@lawyersforcleanwater.com
3  LAWYERS FOR CLEAN WATER, INC.
   1004-A O'Reilly Avenue
4  San Francisco, California 94129
   Telephone: (415) 440-6520
5  Facsimile: (415) 440-4155

6
   *Attorneys for Plaintiff*
7  CALIFORNIA SPORTFISHING
   PROTECTION ALLIANCE
8

9

10

11

12                    UNITED STATES DISTRICT COURT

13                    EASTERN DISTRICT OF CALIFORNIA

14
   CALIFORNIA SPORTFISHING PROTECTION          Civil Case No.: 2:14-cv-01254-JAM-CKD
15 ALLIANCE, a non-profit corporation,

16            Plaintiff,                         [PROPOSED] CONSENT DECREE

17       v.

18
   PICK-N-PULL AUTO DISMANTLERS, *et al.*
19                                              **(Federal Water Pollution Control Act,
              Defendants.                        33 U.S.C. § 1251 *et seq.*)**
20

21

22

23

24

25

26

27

28

## CONSENT DECREE

The following Consent Decree is entered into by and between Plaintiff California Sportfishing Protection Alliance ("Plaintiff" or "CSPA"), and Defendants Pick-N-Pull Auto Dismantlers, a California general partnership, Pick and Pull Auto Dismantling, Inc., and Norprop, Inc. (collectively "Defendants" or "PNP"). The entities entering into this Consent Decree are each an individual "Settling Party" and collectively "Settling Parties."

WHEREAS, CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and restoration of the environment, the wildlife and the natural resources of all waters of California, including the Sacramento River, the American River, and the Sacramento-San Joaquin River Delta;

WHEREAS, Plaintiff alleges that Pick and Pull Auto Dismantling, Inc., Schnitzer Steel Industries, Inc., Auto Parts Group, Norprop Inc., and Pick-N-Pull Auto Dismantlers are each an owner and/or operator of the automobile dismantling and used auto parts facility located at 7590 Stockton Boulevard Sacramento, California, 95823 (hereinafter the "Facility"). As long as Defendants implement the BMPs identified in Paragraph 14 hereof, and no industrial activity occurs in the Customer Parking Lot, the Customer Parking Lot shall not be considered part of the Facility;

WHEREAS, Defendants aver that Pick-N-Pull Auto Dismantlers is the owner and operator of the Facility, and is responsible for compliance with the requirements of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.* ("Clean Water Act" or "CWA") at the Facility;

WHEREAS, the general partners of Pick-N-Pull Auto Dismantlers are Pick and Pull Auto Dismantling, Inc. and Norprop, Inc.;

WHEREAS, Schnitzer Steel Industries, Inc. is the parent corporation of Pick and Pull Auto Dismantling, Inc., Norprop Inc., and Pick-N-Pull Auto Dismantlers;

WHEREAS, Defendants' operations involve the de-pollution and recycling of end-of-life vehicles, thus contributing to protection of the environment and conservation of natural resources;

WHEREAS, storm water at the Facility discharges from one outfall into the municipal separate storm sewer system operated by the City of Sacramento ("MS4");

1   **WHEREAS,** Plaintiff contends that operations at the Facility result in discharges of pollutants
2   into Facility storm drains, and that those storm drains discharge to surface waters, including Elder Creek
3   and Morrison Creek, which are tributaries to the Sacramento River;

4   **WHEREAS,** discharges from the Facility are currently regulated by the National Pollutant
5   Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources
6   Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("Storm
7   Water Permit") and the Clean Water Act;

8   **WHEREAS,** as of July 1, 2015, storm water discharges from the Facility will be regulated by
9   NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order
10   No. 2014-0057-DWQ ("New Storm Water Permit");

11   **WHEREAS,** Defendants are participants in the California Auto Dismantlers Group ("CADG")
12   Monitoring Program under the Storm Water Permit;

13   **WHEREAS,** on March 21, 2014, Plaintiff sent Pick-N-Pull Auto Dismantlers, Pick and Pull
14   Auto Dismantling, Inc., Norprop, Inc. and Schnitzer Steel Industries, Inc. a notice of intent to file suit
15   ("Notice Letter") under Sections 505(a) and (b) of the CWA, 33 U.S.C. §§ 1365(a) and (b). The Notice
16   Letter alleged violations of Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and
17   1342, and violations of the Storm Water Permit. A copy of the Notice Letter was sent to the United
18   States Environmental Protection Agency ("EPA") Region IX, the State Water Resources Control Board
19   ("State Board") and the Central Valley Regional Water Quality Control Board ("Regional Board");

20   **WHEREAS,** on May 23, 2014, PNP submitted a detailed response to the Notice Letter to
21   Plaintiff, setting forth defenses to many of the alleged violations and describing the steps it had
22   undertaken to correct other alleged violations. Among other things, PNP's response described the
23   structural and non-structural Best Management Practices ("BMPs") employed by the Facility as part of
24   its Storm Water Pollution Prevention Plan ("SWPPP") to reduce or prevent pollutants in storm water
25   discharges;

26   **WHEREAS,** storm water discharged by the Facility flows through Jensen storm water
27   interceptors, oil-water separators, and then is treated by a StormwateRx Clara 90C (a 5,000 gallon
28   capacity four-stage clarifier) and by a StormwateRx Aquip 300GPM treatment system prior to discharge

1  to the MS4;

2       **WHEREAS**, Defendants allege that the StormwateRx Clara 90C was installed at the Facility in

3  May 2011 and the StormwateRx Aquip 300GPM was installed in August 2013;

4       **WHEREAS**, Defendants provided Plaintiff with a copy of the current SWPPP for the Facility

5  on May 23, 2014;

6       **WHEREAS**, on May 21, 2014, Plaintiff filed a complaint against Defendants, in the United

7  States District Court, Eastern District of California (Case No. 2:14-cv-01254-JAM-CKD) alleging

8  ongoing violations of the CWA (hereinafter "Complaint");

9       **WHEREAS**, Pick-N-Pull Auto Dismantlers, Pick and Pull Auto Dismantling, Inc., Norprop,

10  Inc., and Schnitzer Steel Industries, Inc., deny all allegations in the Notice Letter and Complaint, and

11  maintain that their operations are in compliance with the requirements of the CWA and the Storm Water

12  Permit;

13       **WHEREAS**, Plaintiff and Defendants have agreed that it is in the Settling Parties' mutual

14  interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the

15  allegations set forth in the Complaint without further proceedings and without any admission of liability

16  on the part of the Defendants; and

17       **WHEREAS**, all actions taken by Defendants pursuant to this Consent Decree shall be made in

18  compliance with all applicable Federal and State laws and local rules and regulations.

19      **NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

20

21      1.     The Court has jurisdiction over the subject matter of this action pursuant to Section

22  505(a)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A).

23      2.     Venue is appropriate in the Eastern District pursuant to Section 505(c)(1) of the Clean

24  Water Act, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations took place is

25  located within this District.

26      3.     The Complaint states claims upon which, if true, relief may be granted pursuant to

27  Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

28      4.     Plaintiff has standing to bring this action.

---

5.      The Court shall retain jurisdiction over this matter for purposes of enforcing the terms of this Consent Decree for the life of the Consent Decree, or as long thereafter as is necessary for the Court to resolve any pending motion to enforce this Consent Decree.

I.      **AGENCY REVIEW AND TERM OF CONSENT DECREE**

6.      Plaintiff shall submit this Consent Decree to the United States Department of Justice ("DOJ") and the EPA (collectively "Federal Agencies") within four (4) days of the final signature of the Settling Parties for agency review consistent with 40 C.F.R. § 135.5. In the event that the Federal Agencies object to entry of this Consent Decree, the Settling Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies within a reasonable amount of time.

7.      The term "Effective Date" as used in this Consent Decree shall mean the last day for the Federal Agencies to comment on the Consent Decree, i.e., the forty-fifth (45th) day following the Federal Agencies' receipt of the Consent Decree, or the date on which the Federal Agencies provide notice that they require no further review, whichever occurs earlier.

8.      This Consent Decree will terminate two (2) years from the Effective Date, unless there is an ongoing, unresolved dispute regarding Defendants' compliance with this Consent Decree in which case the Consent Decree will terminate upon final resolution of the dispute.

II.     **COMMITMENTS OF THE SETTLING PARTIES**

A.      **Storm Water Pollution Control Best Management Practices.**

9.      In addition to maintaining the current structural and non-structural BMPs described in the Facility's SWPPP,[1] as noted below, Defendants shall develop and implement the additional BMPs identified herein, as well as any other BMPs necessary to comply with the provisions of this Consent Decree and the Storm Water Permit, including but not limited to developing and implementing BMPs that, collectively, are the Best Available Technology Economically Achievable ("BAT") and the Best Conventional Treatment Technology ("BCT"), as well as those necessary to comply with the Storm Water Permit's Receiving Water Limitations.

10.     Facility-Wide BMPs.

---

[1] The current Sacramento Facility SWPPP is attached hereto as Exhibit A, and contains the Facility map, which identifies the specific areas of the Facility referenced in this Consent Decree.

    a.    Evacuation of Automobile Fluid(s). Except as set forth in subparagraph 11.a. below, Defendants agree that they will continue to drain all automobile fluid(s) in the covered vehicle Drain Building (identified on the Facility map).

    b.    Use of Tarping or Other Temporary Covering. Defendants shall continue to inspect tarps and other temporary coverings that are used at the Facility to cover storage bins and other containers used for automobile parts storage to ensure that the tarps and coverings are in place, intact, in good condition and preventing the exposure of pollutant sources to precipitation. The inspections shall take place as part of daily housekeeping activities and before rain events. All tarps or other covers shall be repaired or replaced as necessary to prevent exposure of pollutant sources to precipitation.

    c.    Vehicle Part(s) Storage. Defendants shall continue to inspect the Customer Yard for loose vehicle parts as part of its daily housekeeping activities. Loose vehicle part(s) that are discovered as part of daily housekeeping activities shall be placed inside vehicles, beneath vehicles, or in covered container(s), to prevent the exposure of pollutants to precipitation. Prior to and during rain events, Defendants shall focus their efforts on collection of loose parts that have the greatest potential to contribute pollutants to storm water, but shall not be in breach of this Consent Decree solely based on the discovery of loose vehicle parts in the Customer Yard as long as this provision is being complied with.

    11.    The Hold Area/De-Garbage Area.

    a.    Consistent with its current operating procedures, Defendants shall not remove any automotive fluid(s) from vehicles while they are located in the Hold Area/De-Garbage Area except windshield wiper fluid, refrigerants, power steering fluid and brake fluid, all of which must be evacuated by hand pump. Before draining of fluid(s) in the Hold Area/De-Garbage Area occurs, Defendants will continue to ensure that BMP(s) are being implemented to (1) prevent spillage of fluids onto gravel, and to (2) prevent releases of automotive fluids at the Hold Area/De-Garbage Area from flowing into drain inlets. Once fluids are evacuated, they shall be emptied into appropriate containers stored under cover within the designated storage areas of the Drain Building and Warehouse, consistent with current operating procedures.

    b.    Defendants shall continue to prohibit the placement of any vehicle in the

1  Customer Yard that has not been drained of fluid(s).

2          c.     Defendants shall continue to stage and maintain spill kits in the vicinity of the

3  Hold Area/De-Garbage Area so they are readily available to employees engaged in the evacuation of

4  fluids. The kits shall be labeled in both English and Spanish and shall contain absorbent pillows, oil

5  pads, oil booms and other absorbent materials. Defendants shall continue to train employees engaged in

6  the evacuation of fluids on the proper use of the kits.

7          d.     Consistent with existing operational procedures at the Facility, no automobile

8  dismantling or part(s) removal shall be conducted in the Hold Area/De-Garbage Area with the exception

9  of removal of batteries, wheel weights, mercury switches, and wheel rims. No storage of loose vehicle

10  part(s) shall occur in the Hold Area/De-Garbage Area. If rain is predicted, the engine compartment of

11  any vehicle(s) that does not have a hood will be covered at the end of the operating day to prevent

12  exposure of exposed vehicle part(s) to precipitation.

13          e.     In the event the requirements for an Action Plan are triggered during the term of

14  this Consent Decree (see Paragraph 19 below), Defendants shall consider the implementation of

15  additional BMPs for the Hold Area/De-Garbage Area, such as paving, cover, or other BMPs to prevent

16  the exposure of pollutant source(s) to precipitation. Defendants agree to include a discussion of these

17  BMPs in the Action Plan, and why they are or are not to be developed and implemented to address

18  pollutant level exceedances in discharges. Additional BMPs shall be implemented by the beginning of

19  the next upcoming Wet Season[2] as set forth in Paragraph 20 below.

20          12.    <u>Cleaning and Maintaining Impervious Surfaces.</u>

21          a.     Cleaning: Defendants steam-cleaned the Crush Pad at the Facility in June 2014.

22  Prior to October 1, 2015 and October 1, 2016, Defendants shall steam-clean the Crush Pad and other

23  impervious surfaces at the Facility to remove the build-up of contaminants. In the event the requirements

24  for an Action Plan are triggered during the term of this Consent Decree (see Paragraph 19 below),

25  Defendants shall increase the frequency of steam-cleaning and/or propose additional BMPs to address

26  pollutant level exceedances in discharges. While steam-cleaning, Defendants shall block Outfall #1 in

27  order to prevent any non-storm water from discharging from the Facility.

28    [2] Defined as October 1 – May 31.

1          b.      Patching: After steam-cleaning impervious surfaces, Defendants shall patch, at a

2   minimum, all cracks that are 1/4 inch or wider. In addition, as part of its regularly scheduled paving

3   maintenance activities, Defendants shall repair concrete and other paved surfaces at the Facility by

4   patching and/or replacing the surfaces.

5          c.      Sweeping:  Within fifteen (15) days of the Effective Date, to the extent they have

6   not already done so, Defendants shall develop and implement a plan to sweep all impervious ground

7   surfaces at the Facility using a mechanical sweeper according to the following schedule: (1) at least once

8   a week during the Wet Season, (2) at least twenty-four (24) hours prior to any precipitation event where

9   more than 0.1 inches of rain is predicted in Sacramento with a minimum likelihood of occurrence of

10  fifty-percent (50%) by the National Weather Service, and (3) at least once per month during the Dry

11  Season.[3] Defendants shall keep a log of all sweeping done at the Facility.

12      13.     Cleaning and Maintaining Gravel and Pervious Surfaces. Defendants shall continue to

13  implement their good housekeeping program and inspect the Facility for stained and or contaminated

14  gravel, dirt, and build-up on other pervious surfaces. Defendants shall inspect the surfaces in the

15  Customer Yard, Hold Area and De-Garbage Area on a daily basis, and shall continue to ensure the entire

16  Facility is inspected at least weekly. Consistent with existing operational procedures at the Facility, all

17  significantly stained and/or contaminated gravel shall be replaced upon inspection, except that

18  significantly stained and/or contaminated gravel located underneath a vehicle shall be replaced after the

19  vehicle row has been cleared.

20      14.     Customer Access and Use of the Facility.

21          a.      On-site Automobile Repair. Consistent with existing operational procedures at the

22  Facility, Defendants shall continue to maintain signage in the Customer Parking Lot in English and

23  Spanish, and implement other BMPs as necessary, to prohibit customers and other individuals from

24  using any portion of the Customer Parking Lot for any automobile repair or dismantling activities.

25  Defendants shall continue to maintain such signs including ensuring that the signage is kept in good

26  condition.

27          b.      Within forty-five (45) days of the Effective Date, to the extent they have not

28  [3] Defined as June 1 – September 30.

1   already done so, Defendants shall post signage in English and Spanish in the Customer Yard directing

2   customers to close hoods of vehicles after they have finished part(s) removal. Defendants shall maintain

3   such signs including ensuring that the signage is kept in good condition.

4         c.   Consistent with existing operational procedures at the Facility, to ensure that

5   customers are complying with the signage, and that the BMPs are effective, Defendants shall continue to

6   inspect the Customer Parking Lot at least once per day during operating hours and direct customers to

7   cease any unauthorized automobile repair or dismantling activities in the Customer Parking Lot when

8   such activity is observed.

9         d.   Defendants will continue to place drip pans, rugs, mats and/or scrap carpeting

10   under each vehicle in the Customer Yard. Defendants shall continue to implement the Facility's

11   procedures for the inspection, disposal, and replacement of all drip pans, rugs, mats and/or scrap

12   carpeting to ensure that once they are unable to absorb additional fluid and contaminants they are

13   properly disposed of and replaced.

14         e.   During the Wet Season, Defendants shall continue to require Facility employees

15   to close vehicle hoods as often as possible during operating hours. During the Dry Season, Defendants

16   shall require Facility employees to close vehicle hoods as part of regularly scheduled cleaning activities.

17   Defendants shall close vehicle hoods at least one (1) hour prior to the start of forecasted precipitation

18   with a likelihood of occurrence of sixty-percent (60%) and shall, to the extent feasible, focus their

19   efforts on maintaining vehicle hood closure during rain events.

20         15.   Crush Pad Area. Defendants shall continue to ensure that no vehicle will be crushed

21   unless the fluids have been evacuated and/or drained from it. This requirement shall not be interpreted to

22   require the removal, prior to crushing, of vehicle engines, transmissions or other parts that contained

23   fluids during the operating life of the vehicle, so long as the vehicles have been drained following

24   Defendants' operational protocols and the terms of this Consent Decree. The Settling Parties

25   acknowledge that it is impossible to remove one-hundred-percent (100%) of all automotive fluids from a

26   vehicle and that small amounts of residual fluid may remain. Consistent with the Facility's existing

27   BMPs, Defendants shall implement BMPs at the Crush Pad to ensure that any residual fluids released

28   during the crushing process are cleaned up and removed, preventing their flow into drain inlets. These

1 | BMPs shall be implemented in addition to the Facility's drain inlet protection BMPs.

2 | 16.     <u>Hazardous Material and Secondary Containment</u>. The current inventory, handling and

3 | management procedures for hazardous materials and hazardous wastes shall be detailed in the SWPPP.

4 | All such hazardous materials and hazardous wastes shall continue to be stored in designated "Hazardous

5 | Waste Storage Areas." Hazardous Waste Storage Areas shall be indoors and fully enclosed as stated in

6 | the SWPPP. Hazardous Waste Storage Areas shall have secondary containment for containers with 55

7 | gallons or more of capacity, as required by applicable regulations, including 40 C.F.R. § 112.1(d). If

8 | outdoors, Hazardous Waste Storage Areas shall be protected from exposure to precipitation by roof

9 | cover and/or tarping.

10 | **B.**     **Storm Water Drainage System.**

11 | 17.     <u>Discharge Locations and Storm Water Treatment.</u>

12 | a.     Defendants have re-routed the storm water system at the Facility so that all storm

13 | water is directed through Jensen storm water interceptors and oil-water separators, which then flow to

14 | the StormwateRx Clara 90C for initial treatment and then to the StormwateRx Aquip 3000SBI for

15 | additional treatment prior to discharge to Outfall #1, as identified on the attached Facility map (see

16 | Exhibit A).

17 | b.     Consistent with existing operational procedures, Defendants shall continue to

18 | utilize straw wattles, filters, and/or oil absorbents at each drain inlet at the Facility. Defendants shall

19 | continue to implement the Facility procedures for the inspection and maintenance of all drain inlet

20 | BMPs to ensure the drain inlet BMPs are in place, working as intended, and are being replaced as

21 | needed, and according to manufacturer's schedule. The BMP drain inlet inspections shall continue to

22 | occur on a regular basis during routine weekly inspections, and during and after each rain event.

23 | c.     Defendants shall continue to annually inspect the perimeter of the Facility, and

24 | make any necessary repairs to ensure there are no storm water discharges from the Facility perimeter.

25 | d.     Defendants shall continue to operate and maintain the existing Jensen storm water

26 | interceptors, the oil-water separators, the StormwateRx Clara 90C and the StormwateRx Aquip 300GPM

27 | throughout the term of this Consent Decree.

28 | e.     Defendants shall continue to inspect the Facility's storm water treatment systems

1    and related treatment BMPs on a weekly basis and after significant storm events and remove from them

2    any debris or other materials not related to the control and treatment of storm water (e.g., wood, metal,

3    concrete and other debris).

4        **C.**    **Reduction of Pollutants in Discharges.**

5        18.    <u>Contaminant Reduction</u>. Defendants shall develop and implement BMPs to reduce

6    pollutants in storm water discharges to levels below those in Table 1.[4] However, the presence of any

7    contaminant in any discharge from the Facility in excess of the numeric values in Table 1 shall not be

8    considered a breach of this Consent Decree provided Defendants have implemented BMPs that achieve

9    BAT/BCT including, but not limited to, operation of the Jensen storm water interceptors, the oil-water

10   separators, the StormwateRx Clara 90C and the StormwateRx Aquip 300GPM, and other BMPs

11   identified in the Facility's SWPPP and in this Consent Decree.

**Table 1. Numeric Values for Facility Discharges**

| Contaminant | Value | Source of Value |
|---|---|---|
| Total Suspended Solids | 100 mg/L | 2008 EPA Benchmark |
| Total Recoverable Copper | **0.0156 mg/L** | 2008 EPA Benchmark |
| Total Recoverable Lead | **0.095 mg/L** | 2008 EPA Benchmark |
| Total Recoverable Zinc | **0.130 mg/** | 2008 EPA Benchmark |
| Oil and Grease | 15 mg/L | 2008 EPA Benchmark |
| Total Recoverable Aluminum | 0.750 mg/L | 2008 EPA Benchmark |
| Total Cadmium | **0.0023 mg/L** | 2008 EPA Benchmark |
| Total Recoverable Iron | 1.0 mg/L | 2008 EPA Benchmark |
| Total Recoverable Mercury | 0.0014 mg/L | 2008 EPA Benchmark |
| Biochemical Oxygen Demand | **30 mg/L** | 2008 EPA Benchmark |
| pH | 6.5-8.5 units | Basin Plan |

19       19.    <u>Action Plan for Table 1 Exceedances</u>. If the result(s) from any sampling event(s)

conducted during a Wet Season reveals any contaminant at a concentration above the numeric value(s)

specified in Table 1, Defendants shall submit a plan to Plaintiff for reducing the level of contaminant to,

or below, Table 1 levels ("Action Plan"). An Action Plan shall be submitted by July 1 following the Wet

Season during which the numeric value exceedance(s) occurs. Defendants shall only submit one Action

Plan per Wet Season, if at all, for a maximum of two (2) Action Plans during the term of this Consent

---

[4] Several of the values in the table are hardness dependent, as indicated in boldface type. Values based on 2008 EPA Benchmarks assume hardness of 101 mg/l CaCO₃.

1  Decree. Nothing herein shall be construed as an admission by Defendants that the values in Table 1 must

2  be achieved in order for the Facility to be in compliance with either the Storm Water Permit or the New

3  Storm Water Permit.

4        20.    <u>Action Plan Requirements</u>. Each Action Plan submitted shall include at a minimum: (1)

5  the identification of the contaminant(s) discharged in excess of the numeric value(s); (2) an assessment

6  of the source of each contaminant discharged in excess of the numeric value(s); (3) the identification of

7  additional BMPs, including treating storm water prior to discharge from the Facility, that will reduce

8  pollutant concentrations; and (4) time schedules for implementation of the proposed BMPs. The time

9  schedule(s) for implementation shall ensure that all BMPs are implemented as soon as possible but at

10  least by the beginning of the upcoming Wet Season (i.e., by October 1) unless the Settling Parties agree

11  on a later date based on the time needed to design, procure, and install the necessary equipment. Any

12  disputes over the deadline for implementation of additional BMPs identified in an Action Plan shall be

13  resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section III

14  below.

15        21.    <u>Action Plan Review</u>. CSPA shall have thirty (30) days upon receipt of Defendants'

16  Action Plan to provide Defendants with comments on the Action Plan. Defendants have thirty (30) days

17  upon receipt of CSPA's comments on the Action Plan, to consider CSPA's comments, and shall either

18  incorporate them into the Action Plan or, if Defendants decline to accept one or more of CSPA's

19  comments, provide CSPA with a written explanation of the grounds for rejection on or before the end of

20  the thirty (30) day period. Disputes regarding the adequacy of a particular BMP shall not impact the

21  schedule for implementing any other BMP set forth in the Action Plan, except to the extent an

22  undisputed BMP is related to a disputed BMP. Any disputes as to the adequacy of the Action Plan shall

23  be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section III

24  below.

25        22.    Defendants shall contact Plaintiff to request an extension of any deadline set forth in this

26  Consent Decree, if necessary, to implement any structural BMPs requiring agency approval. Plaintiff's

27  consent to Defendants' requested extension shall not be unreasonably withheld.

28        23.    Defendants shall revise their SWPPP and Monitoring & Reporting Plan ("M&RP") as

1    applicable within thirty (30) days to reflect the changes required by an Action Plan. Defendants shall

2    notify CSPA in writing when the Action Plan has been completely implemented.

3        **D.    Storm Water Sampling.**

4        24.    Sampling. During the life of this Consent Decree, Defendants agree to collect storm water

5    samples from each location where storm water is discharged from the Facility from at least four (4)

6    qualifying rain events per Wet Season. All sampling shall be conducted as described in subparagraphs a.

7    through j.

8            a.    For purposes of this Consent Decree, a qualifying rain event is one that produces a

9    discharge and is preceded by forty-eight (48) hours without a discharge.

10           b.    Defendants shall sample within four (4) hours of: (1) the start of discharge, or (2) the

11   start of Facility operations if the qualifying rain event (as identified in (a), above) occurs within the

12   previous twelve (12) hour period. Nothing herein shall be construed to require Defendants to collect

13   storm water samples outside of the Facility's normal hours of operation.

14           c.    If, prior to March 1 of a Wet Season, Defendants have been unable to collect samples

15   from two (2) qualifying rain events, Defendants shall satisfy the sampling requirements of this Consent

16   Decree by sampling non-qualifying rain events, but shall still endeavor to collect samples from a

17   qualifying rain event.

18           d.    Defendants agree to collect storm water samples from other discharge point(s) at the

19   Facility that are created due to a change in operation or other circumstances, or are otherwise required to

20   be sampled by the Storm Water Permit, the New Storm Water Permit, or this Consent Decree.

21           e.    Defendants shall analyze each storm water sample for the contaminants set forth in

22   Table 1.

23           f.    A laboratory accredited by the State of California shall analyze all samples collected

24   pursuant to this Consent Decree.

25           g.    The laboratory shall use analytical methods adequate to detect the individual

26   contaminants at or below the values specified in Table 1.

27           h.    All samples collected from the Facility shall be delivered to the laboratory as

28   necessary to ensure that sample "hold time" is not exceeded.

[Proposed] Consent Decree                    12                    Civil Case No. 2:14-cv-01254-JAM-CKD

1        i.    Defendants shall request that sample-analysis results be reported to it within ten (10)

2  business days of laboratory receipt of the sample.

3        j.    Defendants shall provide CSPA with the lab results, including a copy of the complete

4  laboratory report of all samples collected at the Facility, within five (5) business days of receiving the

5  results.

6      **E.**    **Visual Observations.**

7      25.    All BMPs shall be visually inspected at least weekly and after significant rain events. In

8  addition, all visual observations of storm water discharges shall be conducted in accordance with the

9  terms of the Storm Water Permit and this Consent Decree. During the life of this Consent Decree,

10  Defendants shall continue to conduct Daily Rain Checks at the Facility, documenting any rain events

11  that occur during working hours, including any associated discharge. Defendants shall maintain logs of

12  the Daily Rain Checks, which shall be included in Defendants' Annual Reports submitted to the

13  Regional Board, and within ten (10) days of receipt of Plaintiff's written request.

14      **F.**    **Employee Training.**

15      26.    Within sixty (60) days of the Effective Date, Defendants shall conduct additional

16  employee training in order to familiarize employees at the Facility as appropriate with the requirements

17  of the Storm Water Permit and this Consent Decree. The training program shall include use of written

18  training materials needed for effective implementation of the training program. Defendants shall also

19  ensure that there are a sufficient number of employees assigned to implement the BMPs and conduct

20  other compliance activities required by the Storm Water Permit and this Consent Decree, and that these

21  employees are properly trained to perform the required activities.

22      27.    The training program shall require at least the following:

23      a.    <u>Non-Storm Water Discharge Training</u>. The Defendants shall continue to train

24  employees, as appropriate to their particular job descriptions, on the Storm Water Permit's prohibition of

25  non-storm water discharges, so that employees know what non-storm water discharges are, which can

26  result from improper draining of automobile fluids, and how to detect and prevent them;

27      b.    <u>BMP Training</u>. The Defendants shall continue to train employees, as appropriate to

28  their particular job descriptions, on BMP implementation and maintenance to ensure that BMPs are

1    implemented effectively to prevent or minimize the exposure of pollutants to storm water, to prevent or
2    minimize the discharge of contaminated storm water, and to ensure the proper treatment of storm water
3    at the Facility;

4            c.    Sampling Training. The Defendants shall designate an adequate number of employees
5    to ensure the collection of storm water samples from each discharge location as required by this Consent
6    Decree and/or the Storm Water Permit. The training shall continue to include the proper sampling
7    protocols, including chain of custody requirements, to ensure storm water samples are properly
8    collected, stored, and submitted to a certified laboratory.

9            d.    Visual Observation Training. The Defendants shall provide training to all individuals
10   performing visual observations at the Facility pursuant to this Consent Decree and/or the Storm Water
11   Permit.

12       28.    Training shall continue to be provided on an annual basis, or as otherwise required to
13   ensure compliance with the terms of this Consent Decree, by a private consultant or a representative of
14   Defendants who is familiar with the requirements of this Consent Decree and the Storm Water Permit.
15   The training shall be repeated as necessary to ensure that employees are familiar with the requirements
16   of this Consent Decree, the Storm Water Permit, and the Facility's SWPPP and M&RP, as appropriate
17   to the particular employee's job descriptions. Any new employee who is responsible for implementation
18   of any portion of the SWPPP, the M&RP, or compliance with other terms of the Storm Water Permit or
19   Consent Decree shall receive training within thirty (30) days after being hired or before being
20   responsible for compliance with the terms of the Storm Water Permit or Consent Decree.

21       29.    The Defendants shall maintain training records to document compliance with Section II.F
22   of this Consent Decree, and shall make these records available for Plaintiff's review at the Facility. The
23   Training Program shall be specified in the SWPPP and Defendants shall modify the SWPPP as
24   necessary to reflect the training program required by this Consent Decree.

25   **G.    Storm Water Pollution Prevention and Monitoring and Reporting Plans.**

26       30.    Within sixty (60) days after the Effective Date of this Consent Decree, Defendants shall
27   further revise their SWPPP and their M&RP to the extent necessary to:

28            a.    Include current BMPs;

b.   Incorporate the requirements of the Storm Water Permit and this Consent Decree;

c.   Incorporate BMPs identified and developed pursuant to this Consent Decree;

d.   Include information contained in other documents that the SWPPP and/or M&RP refer to, such as CADG documents, as appendices to the SWPPP and/or M&RP;

e.   Identify the individuals responsible for compliance with the Storm Water Permit and this Consent Decree including specifying which position or job description is responsible for what area of compliance (e.g., Store Manager, collecting samples);

f.   Include a site map that includes at a minimum current conditions at the Facility, and all information required by the Storm Water Permit and this Consent Decree;

g.   Identification of specific pollutant(s) associated with each industrial activity and/or pollutant source, and BMPs for each potential pollutant source;

h.   Description of specific maintenance of structural BMPs such as maintenance on the filtration system, secondary containment, and berms.

i.   Include, and modify as applicable, Defendants' visual inspection checklist that will be used by trained Facility personnel when conducting the visual observations and monitoring of storm water required under the Storm Water Permit and/or under this Consent Decree.

j.   Include the Storm Water Permit's sampling and monitoring requirements including but not limited to the Facility's sample locations, and sample analysis for all applicable pollutants including at a minimum those listed in Table 1.

31.   Commenting on the SWPPP and M&RP Revisions. Defendants shall submit the revised SWPPP and M&RP to CSPA for review and comment as soon as it is completed but in any event no later than sixty (60) days after the Effective Date. CSPA shall provide comments, if any, to Defendants within thirty (30) days of receipt of the SWPPP and M&RP. Within thirty (30) days after receipt of comments from CSPA, Defendants shall incorporate CSPA's comments into the SWPPP and M&RP or shall justify in writing why any comment is not incorporated. Any disputes over the adequacy of the revised SWPPP and M&RP shall be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section III below.

32.   Additional Revisions to SWPPP and M&RP. Defendants shall revise the SWPPP and

1  M&RP if there are any changes in the Facility's operations that may possibly affect the quality of storm

2  water discharges at the Facility, including but not limited to changes to storm water discharge point(s) or

3  changes or additions to the BMPs at the Facility resulting from an Action Plan. Defendants shall submit

4  any revised SWPPP and M&RP to CSPA for review and comment within five (5) days of completion.

5  CSPA shall provide comments, if any, to Defendants within thirty (30) days of receipt of any revised

6  SWPPP and M&RP. Within thirty (30) days of receiving comments from CSPA, Defendants shall

7  incorporate CSPA's comments into any revised SWPPP and M&RP or shall justify in writing why any

8  comment is not incorporated. Any disputes as to the adequacy of the SWPPP and M&RP shall be

9  resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section III

10  below.

11       **H.**    **Compliance Monitoring and Reporting**

12       33.    <u>Site Inspections</u>. Each year during the life of this Consent Decree, Plaintiff and its

13  representatives may conduct up to two (2) site inspections at the Facility, plus an additional inspection if

14  there is a dispute regarding compliance with the terms of this Consent Decree. The site inspections shall

15  occur during normal business hours, and Plaintiff shall provide Defendants with three (3) business days

16  advance notice of an intended inspection during the Dry Season, and at least forty-eight (48) hours

17  advance notice for a Wet Season inspection. Plaintiff agrees that during inspections, Plaintiff's

18  representatives will wear safety goggles, hard hats, ear plugs and vests, which will be provided by

19  Defendants. Plaintiff also agrees to wear appropriate clothing and footwear, and remain in the presence

20  of PNP representatives at all times. If Plaintiff seeks to enter a portion of the Facility that Defendants

21  deem unsafe, the Settling Parties will discuss Defendants' concern in an attempt to resolve the concern

22  so the inspection can continue. If the Settling Parties cannot resolve Defendants' concern, any disputes

23  regarding the conduct of an inspection shall be resolved pursuant to the dispute resolution provisions of

24  this Consent Decree, set out in Section III below. In addition, if Plaintiff discloses any information to the

25  public that was collected during the inspection, including observations, notes, analytical data or other

26  information, all such information shall be shared with Defendants at the same time it is made available

27  to the public.

28       34.    During the site inspection, Plaintiff and/or its representatives shall be allowed access to

1  the Facility's SWPPP, M&RP, and other monitoring records, reports, and sampling data pertaining to

2  storm water, and/or compliance with this Consent Decree, for the Facility. In addition, during the site

3  inspection, Plaintiff and/or its representatives may collect samples of discharges from the Facility in the

4  presence of Defendants or their representatives. Any samples collected by Plaintiff shall be submitted to

5  a certified California laboratory for analysis in accordance with the provisions of Paragraph 24 of this

6  Consent Decree. Copies of the complete laboratory reports shall be provided to Defendants within five

7  (5) business days of receipt. At the request of Defendants, Plaintiff shall, if sufficient flow is available,

8  provide Defendants with duplicate samples of any samples collected by Plaintiff, provided that nothing

9  herein shall require Defendants to submit such samples for analysis. If Defendants request duplicate

10  samples, they shall provide the necessary sample container(s) to Plaintiff for this purpose. If Defendants

11  elect to analyze the duplicate samples, the analyses shall be conducted in accordance with the

12  requirements of Paragraph 24, and a copy of the final laboratory report shall be provided to Plaintiff

13  with five (5) business days of receipt of the results.

14      35.  <u>Compliance Monitoring and Oversight</u>. Defendants shall pay Plaintiff the sum of Four

15  Thousand Dollars ($4,000.00) per year (totaling $8,000.00) during the term of the Consent Decree to

16  help defray Plaintiff's costs of monitoring and overseeing Defendants' compliance with this Consent

17  Decree. Payment of Four Thousand Dollars ($4,000.00) shall be made within ten (10) days after the

18  Effective Date, and Four Thousand Dollars ($4,000.00) on the first anniversary of the Effective Date.

19  Defendants' checks shall be made payable to: "Lawyers for Clean Water Attorney Client Trust

20  Account" and shall be delivered by certified mail or overnight delivery to: Lawyers for Clean Water,

21  Inc., 1004-A O'Reilly Avenue, San Francisco, California 94129.

22      36.  <u>Action Plan Payments</u>. If Defendants are required to submit an Action Plan to CSPA in

23  accordance with Paragraph 19, Defendants shall make Action Plan payments payable to: "Lawyers for

24  Clean Water Attorney Client Trust Account" and shall deliver such payments by certified mail or

25  overnight delivery to: Lawyers for Clean Water, Inc., 1004-A O'Reilly Avenue, San Francisco,

26  California 94129 at the time the Action Plan is submitted to CSPA. The Action Plan payments shall be

27  made as follows:

28      a.  <u>Limited Action Plan Payment</u>. In circumstances where there are no more than two (2)

1   contaminants exceeding Table 1 numeric values in no more than a single rain event in a Wet Season,

2   and sampling was conducted as required by this Consent Decree and the Storm Water Permit,

3   Defendants shall make an additional initial compliance monitoring payment in the amount of Five

4   Hundred Dollars ($500.00) upon submission of the Action Plan. For example, if copper and zinc were

5   the only parameters exceeded for the entire Wet Season and were exceeded only once, then payment

6   under this subsection will be made. If zinc and copper were each exceeded in one sample event, and zinc

7   was exceeded during a second sample event, payment will be made under subsection b. below.

8          b.      Regular Action Plan Payment. In all other circumstances, Defendants shall make an

9   initial additional compliance monitoring payment in the amount of One Thousand Five Hundred Dollars

10  ($1,500.00) upon submission of the Action Plan.

11         c.      Thereafter, in the event that the initial payment is insufficient to cover the cost of CSPA's

12  review of the Action Plan, Defendants agree to reimburse CSPA its additional costs, up to a maximum

13  of One Thousand Five Hundred Dollars ($1,500.00), for a total Action Plan payment of Three Thousand

14  Dollars ($3,000.00) for any single Action Plan. Plaintiff shall submit an invoice to Defendants

15  documenting its additional costs, which shall be paid within thirty (30) days of receipt in accordance

16  with the provisions of this paragraph.

17         37.     Reporting and Document Provision. During the life of this Consent Decree, Defendants

18  shall copy Plaintiff on all documents related to water quality at the Facility that are submitted to the

19  Regional Board, the State Board, and/or any State or local agency or municipality. Such reports and

20  documents shall be provided to Plaintiff concurrently as they are sent to the agencies and/or

21  municipalities. Any correspondence related to Defendants' compliance with the Storm Water Permit or

22  storm water quality received by Defendants from any regulatory agency, State or local agency, county or

23  municipality shall be provided to CSPA within five (5) business days of receipt by Defendants.

24         I.      **Environmental Project, Litigation Fees and Costs, and Stipulated Penalties**

25         38.     Environmental Mitigation Project. To remediate environmental harms as alleged in the

26  Complaint, Defendants shall pay Thirty Five Thousand Dollars ($35,000.00) to be used to fund

27  environmental project activities that will benefit the Sacramento River watershed, and, to the extent

28  possible, with an emphasis on its tributaries such as Elder Creek ("the Mitigation Payment"). The

[Proposed] Consent Decree                    18                    Civil Case No. 2:14-cv-01254-JAM-CKD

1  Mitigation Payment shall be paid to the Rose Foundation for Communities and the Environment, 6008
2  College Avenue, Suite 10, Oakland, California 94618 attention Tim Little. The Mitigation Payment shall
3  be made within sixty (60) days of the Effective Date of this Consent Decree, and Defendants shall
4  concurrently provide Plaintiff with a copy of such payment. Plaintiff shall coordinate with the Rose
5  Foundation to provide DOJ with the information set out in Paragraph 5 of the Notification on Receipt of
6  a Clean Air Act or Clean Water Act Citizen Suit Complaint ("Notification") (DOJ, Environment and
7  Natural Resources Division, February 2012), attached hereto as Exhibit B. Plaintiff shall inform the
8  Rose Foundation that it is required to copy Defendants on any reporting to DOJ regarding the
9  disbursement of the Mitigation Payment. No portion of the Mitigation Payment may be made to
10  Plaintiff.

11      39.    CSPA's Fees and Costs. Defendants agree to reimburse CSPA for its investigation fees
12  and costs, expert/consultant fees and costs, reasonable attorneys' fees, and other costs incurred as a
13  result of investigating and preparing this lawsuit, and negotiating a resolution of this matter, in an
14  amount totaling Sixty-Six Thousand Five Hundred Dollars ($66,500.00), which amount shall be paid in
15  full for Lawyers for Clean Water's fees and costs, and any experts that were retained in connection with
16  this matter. Such payment shall be made within thirty (30) days of the Effective Date, payable to:
17  "Lawyers for Clean Water Attorney Client Trust Account" and delivered by certified mail or overnight
18  delivery to: Lawyers for Clean Water, Inc., 1004-A O'Reilly Avenue, San Francisco, California 94129.

19      40.    Stipulated Payment. The Defendants shall make a stipulated payment of One Thousand
20  Dollars ($1,000.00) for each missed deadline included in this Consent Decree. Payments for a missed
21  deadline shall be made to fund environmental project activities that will benefit the Sacramento-San
22  Joaquin River Delta and its watershed and shall be made to the Rose Foundation to the address listed
23  above. The Defendants agree to make the stipulated payment within thirty (30) days of a missed
24  deadline. Defendants shall provide Plaintiff with a copy of each such payment at the time it is made.

25      41.    Interest Payments. In the event of late payment of any of the sums due to Plaintiff under
26  this Consent Decree, the Defendants shall pay ten-percent (10%) APR interest to Plaintiff, which shall
27  accrue from the first day past the date the sum was due until the date the Defendants tender payment. All
28  such payments shall be made payable to: "Lawyers for Clean Water Attorney Client Trust Account" and

1  delivered by certified mail or overnight delivery to: Lawyers for Clean Water, Inc., 1004-A O'Reilly

2  Avenue, San Francisco, California 94129.

3  **III.     DISPUTE RESOLUTION**

4  42.     This Court shall retain jurisdiction over this matter until the Consent Decree terminates in

5  accordance with Paragraph 8 for the purposes of implementing and enforcing the terms and conditions

6  of this Consent Decree, and adjudicating all disputes among the Settling Parties that may arise under the

7  provisions of this Consent Decree. The Court shall have the power to enforce this Consent Decree with

8  all available legal and equitable remedies, including contempt.

9  43.     Meet and Confer. A Settling Party to this Consent Decree shall invoke the dispute

10  resolution procedures of this Section by notifying all other Settling Parties in writing of the matter(s) in

11  dispute. The Settling Parties shall then meet and confer in good faith (either telephonically or in person)

12  in an attempt to resolve the dispute informally over a period of twenty (20) calendar days from the date

13  of the notice.

14  44.     If the Settling Parties cannot resolve a dispute by the end of meet and confer informal

15  negotiations, the party initiating the dispute resolution provision may invoke formal dispute resolution

16  by filing a motion before the United States District Court for the Eastern District of California. The

17  Settling Parties agree not to object to an expedited hearing schedule on the motion if one of the Settling

18  Parties requests one.

19  45.     Burden of Proof. In the event of any disagreement or dispute between Plaintiff and

20  Defendants over the necessity or appropriateness of implementing any particular BMP or set of BMPs,

21  including in any formal or informal proceeding brought to enforce the terms of this Consent Decree,

22  Defendants shall bear the burden of demonstrating that its BMPs, collectively, constitute BAT/BCT for

23  the Facility, or that they are in compliance with the terms of this Consent Decree. Plaintiff shall not be

24  required to prove that Defendants' BMPs do not constitute BAT/BCT.

25  46.     Litigation costs and fees incurred in conducting meet and confer or otherwise addressing

26  and/or resolving any dispute, including an alleged breach of this Consent Decree, shall be awarded in

27  accord with the standard established by Section 505 of the Clean Water Act, 33 U.S.C. § 1365, and case

28  law interpreting that standard.

1  **IV.   MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE**

2       47.     CSPA's Release. Upon the Effective Date of this Consent Decree, CSPA, on its own

3  behalf and on behalf of its current and former officers, directors, employees, subsidiaries, and affiliates,

4  and each of their successors and assigns, and its agents, attorneys, and other representatives releases all

5  persons including, without limitation, Defendants and each of their current and former officers,

6  directors, members, employees, shareholders and each of their predecessors, successors and assigns, and

7  each of their agents, attorneys, consultants, and other representatives from, and waives all claims which

8  arise from or pertain to this action, including all claims for injunctive relief, damages, penalties, fines,

9  sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other

10  sum incurred or claimed, and/or claims that were asserted in CSPA's Notice Letter and Complaint up to

11  the Effective Date.

12       48.     Defendants' Release. Upon the Effective Date of this Consent Decree, Defendants, on

13  each of their own behalves and on behalf of their current and former officers, directors, employees,

14  members, and each of their successors and assigns, and their agents, attorneys, and other representatives

15  releases CSPA (and its current and former officers, directors, employees, members, parents, subsidiaries,

16  and affiliates, and each of their successors and assigns, and its agents, attorneys, and other

17  representatives) from, and waives all claims which arise from or pertain to this action, including all

18  claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum

19  incurred or claimed or which could have been claimed for matters associated with or related to CSPA's

20  Notice Letter and Complaint up to the Effective Date.

21       49.     Nothing in this Consent Decree limits or otherwise affects CSPA's right to address or

22  take any position that it deems necessary or appropriate in any formal or informal proceeding before the

23  Regional Board, EPA, or any other judicial or administrative body on any other matter relating to storm

24  water discharges from the Facility occurring or arising after the Effective Date of the Consent Decree

25  but specifically excluding the discharges and all other matters addressed by this Consent Decree.

26  **V.    MISCELLANEOUS PROVISIONS**

27       50.     No Admission of Liability. Neither this Consent Decree, the implementation of additional

28  BMPs, nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding,

1  | adjudication, admission or acknowledgment of any fact, law, or liability, nor shall it be construed as an
2  | admission of violation of any law, rule, or regulation. Defendants maintain and reserve all defenses they
3  | may have to any alleged violations that may be raised in the future.

4  |      51. <u>Force Majeure</u>. Force Majeure includes any act of God, war, fire, earthquake, windstorm,
5  | flood or natural catastrophe; civil disturbance, vandalism, sabotage or terrorism; restraint by court order
6  | or public authority or agency; or action or non-action by, or inability to obtain the necessary
7  | authorizations or approvals from any governmental agency. Force Majeure shall not include normal
8  | inclement weather, economic hardship, or inability to pay. Any Settling Party seeking to rely upon this
9  | paragraph to excuse or postpone performance, shall have the burden of establishing that it could not
10 | reasonably have been expected to avoid the force majeure event and which by exercise of due diligence
11 | has been unable to overcome the failure of performance. The Settling Parties shall exercise due diligence
12 | to resolve and remove any force majeure event.

13 |      52. <u>Construction</u>. The language in all parts of this Consent Decree shall be construed
14 | according to its plain and ordinary meaning, except as to those terms defined in the Storm Water Permit,
15 | the Clean Water Act, or specifically herein.

16 |      53. <u>Choice of Law</u>. The laws of the United States shall govern this Consent Decree.

17 |      54. <u>Severability</u>. In the event that any provision, paragraph, section, or sentence of this
18 | Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall
19 | not be adversely affected.

20 |      55. <u>Correspondence</u>. All notices required herein or any other correspondence pertaining to
21 | this Consent Decree shall be sent by overnight mail or courier or by electronic mail, with request for
22 | confirmation receipt, as follows:

23 |     <u>If to Plaintiff:</u>
24 |     Layne Friedrich
   |         Layne@lawyersforcleanwater.com
25 |     Drevet Hunt
   |         Drev@lawyersforcleanwater.com
26 |     Lawyers for Clean Water, Inc.
   |     1004-A O'Reilly Avenue
27 |     San Francisco, California 94129

28 |     With copies to:

---

Bill Jennings, Executive Director
    Deltakeep@me.com
California Sportfishing Protection Alliance
3536 Rainier Avenue
Stockton, California 95204

If to Defendants:

Margaret Rosegay
    margaret.rosegay@pillsburylaw.com
Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center, 22nd Floor
San Francisco, California 94111

With copies to:

Charina Gaspay
    cgaspay@picknpull.com
Pick-n-Pull EHS Department
10850 Gold Center Drive, Suite 325
Rancho Cordova, California 95670

Michael Brinkley
    mbrinkley@picknpull.com
Pick-N-Pull Auto Dismantlers
10850 Gold Center Drive, Suite 325
Rancho Cordova, California 95670

Notifications of communications shall be deemed submitted the next business day after having been deposited with an overnight mail/delivery service. Any change of address or addresses shall be communicated in the manner described above for giving notices. In addition, the Settling Parties may agree to transmit documents electronically or by facsimile.

56. <u>Effect of Consent Decree</u>. Except as provided herein, Plaintiff does not, by its consent to this Consent Decree, warrant or aver in any manner that Defendants' compliance with this Consent Decree will constitute or result in compliance with any Federal or State law or regulation. Nothing in this Consent Decree shall be construed to affect or limit in any way the obligation of Defendants to comply with all Federal, State, and local laws and regulations governing any activity required by this Consent Decree.

57. <u>Counterparts</u>. This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document. Telecopy, email of a .pdf signature and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this

1   Consent Decree.

2       58.    Modification of the Consent Decree. This Consent Decree, and any provisions herein,

3   may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the

4   Settling Parties.

5       59.    Dismissal of Schnitzer Steel Industries, Inc. Following entry of this Consent Decree by

6   this Court, Schnitzer Steel Industries, Inc. shall be dismissed from this litigation with prejudice, and

7   shall not be considered a Settling Party or otherwise bound by the terms of this Consent Decree.

8       60.    Full Settlement. This Consent Decree constitutes a full and final settlement of this matter.

9       61.    Integration Clause. This is an integrated Consent Decree. This Consent Decree is

10  intended to be a full and complete statement of the terms of the agreement between the Settling Parties

11  and expressly supersedes any and all prior oral or written agreements covenants, representations, and

12  warranties (express or implied) concerning the subject matter of this Consent Decree.

13      62.    Authority. The undersigned representatives for Plaintiff and Defendants each certify that

14  he/she is fully authorized by the party whom he/she represents to enter into the terms and conditions of

15  this Consent Decree.

16      63.    The provisions of this Consent Decree apply to and bind the Settling Parties, including

17  any successors or assigns. The Settling Parties certify that their undersigned representatives are fully

18  authorized to enter into this Consent Decree, to execute it on behalf of the Settling Parties, and to legally

19  bind the Settling Parties to its terms.

20      64.    The Settling Parties agree to be bound by this Consent Decree and not to contest its

21  validity in any subsequent proceeding to implement or enforce its terms. By entering into this Consent

22  Decree, the Defendants do not admit liability for any purpose as to any allegation or matter arising out

23  of this Action.

24      IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date first

25  set forth above.

    **IT IS SO ORDERED:**

26

27                                           Honorable Judge John A. Mendez
                                             UNITED STATES DISTRICT COURT JUDGE
28  Date: _November 21, 2014_                EASTERN DISTRICT OF CALIFORNIA

APPROVED AS TO FORM

LAWYERS FOR CLEAN WATER, INC.

Dated: _Sept. 29_ 2014          By: _[signature]_
                                     Layne Friedrich
                                     Attorney for Plaintiff

PILLSBURY WINTHROP SHAW PITTMAN LLP

Dated: _____ 2014          By: _____
                                     Margaret Rosegay
                                     Attorney for Defendants

APPROVED AS TO CONTENT

Dated: _26 Sep_ 2014             By: _[signature]_
                                     Bill Jennings
                                     California Sportfishing Protection Alliance

Dated: _____ 2014          By: _____
                                     Michael Brinkley
                                     Pick and Pull Auto Dismantling, Inc.

Dated: _____ 2014          By: _____
                                     Michael Brinkley
                                     Norprop, Inc.

Dated: _____ 2014          By: _____
                                     Michael Brinkley
                                     Pick-N-Pull Auto Dismantlers

| [Proposed] Consent Decree | 25 | Civil Case No. 2:14-cv-01254-JAM-CKD |

1

APPROVED AS TO FORM

2

3                                    LAWYERS FOR CLEAN WATER, INC.

4    Dated: _____ 2014        By: _____
5                                          Layne Friedrich
                                           Attorney for Plaintiff
6
                                     PILLSBURY WINTHROP SHAW PITTMAN LLP
7

8    Dated: *Oct. 1,* 2014            By: *Margaret Rosegay*
9                                          Margaret Rosegay
                                           Attorney for Defendants
10

11   APPROVED AS TO CONTENT

12

13   Dated: _____ 2014        By: _____
                                           Bill Jennings
14                                         California Sportfishing Protection Alliance

15

16

17   Dated: *Oct. 1,* 2014            By: _____
18                                         Tom Klauer
                                           Pick and Pull Auto Dismantling, Inc.
19

20

21   Dated: *Oct. 1,* 2014            By: _____
22                                         Tom Klauer
                                           Norprop, Inc.
23

24   Dated: *Oct. 1,* 2014            By: _____
25                                         Tom Klauer
                                           Pick-N-Pull Auto Dismantlers
26

27

28

---

[Proposed] Consent Decree                25                Civil Case No. 2:14-cv-01254-JAM-CKD

# STORM WATER POLLUTION
# PREVENTION PLAN (SWPPP)

### PICK-n-PULL
SACRAMENTO – STORE #10
### WDID No. 5S34I001815

7600 Stockton Boulevard
Sacramento, CA 95823

Revised: May 2014



10850 Gold Center Drive, Suite 325, Rancho Cordova, CA 95670
www.picknpull.com / www.schnitzersteel.com

# STORMWATER POLLUTION PREVENTION PLAN

## SWPPP REVISION HISTORY

| NO. | DATE | REVISIONS/MODIFICATIONS | CHANGES BY | APPROVED |
|---|---|---|---|---|
| 1 | 02/06/2008 | More Frequent and Stringent Housekeeping and documentation log. See attached log and housekeeping instructions. | Chris Orsolini, Corporate Environ | John Tomasello, Store Manager |
| 2 | 06/01/2008 | Drain Inlet Protection BMP | Chris Orsolini, Corporate Environ | John Tomasello, Store Manager |
| 3 | 07/01/2009 | Revised APB Drain Inlet Protection BMP | Chris Orsolini, Corporate Environ | John Tomasello, Store Manager |
| 4 | 07/01/2009 | Sacramento Housekeeping Action Plan | Chris Orsolini, Corporate Environ | John Tomasello, Store Manager |
| 5 | 07/01/20111 | Added new stormwater separator BMP and updated Site Map to reflect separator. | Chris Orsolini, Corporate Environ | John Tomasello, Store Manager |
| 6 | 05/10/2012 | Specified minimum frequency for cleaning of stormwater treatment systems. | Chris Orsolini, Corporate Environ | John Tomasello, Store Manager |
| 7 | 08/21/2013 | Revised SWPPP and Site Map to include installation of filter system to treat stormwater. | Rob Ellsworth, Corp. Environmental Sustainability Analyst | James Smith, Store Manager |
| 8 | 05/23/2014 | Updated contact information, updated Site Map, general reformatting edits. | Charina Gaspay, Environmental Engineer | James Smith, Store Manager |
| 9 |  |  |  |  |
| 10 |  |  |  |  |
| 11 |  |  |  |  |
| 12 |  |  |  |  |
| 13 |  |  |  |  |
| 14 |  |  |  |  |
| 15 |  |  |  |  |
| 16 |  |  |  |  |
| 17 |  |  |  |  |
| 18 |  |  |  |  |
| 19 |  |  |  |  |
| 20 |  |  |  |  |

i

## TABLE OF CONTENTS

1.   **INTRODUCTION** ........................................................................................... 1-1

   1.1.   DEFINING THE STORMWATER ISSUES ................................................. 1-1

   1.2.   STORMWATER POLLUTION PREVENTION PLAN OBJECTIVE ....................... 1-1

2.   **PLANNING AND ORGANIZATION** ..................................................................... 3

   2.1.   STORMWATER POLLUTION PREVENTION TEAM ................................. 3

3.   **ASSESSMENT** ........................................................................................... 5

   3.1.   SITE LOCATION ...................................................................................... 5

   3.2.   INDUSTRIAL PROCESSES ....................................................................... 5

      3.2.1.   Vehicle Receiving ............................................................................ 5

      3.2.2.   Vehicle De-Garbaging ..................................................................... 5

      3.2.3.   Vehicle Draining .............................................................................. 6

      3.2.4.   Customer Yard .................................................................................. 6

      3.2.5.   Crush Pad Area ................................................................................. 6

      3.2.6.   Bay Wash Station .............................................................................. 7

      3.2.7.   Office and Sales Buildings ............................................................... 7

      3.2.8.   Parking Area ..................................................................................... 7

   3.3.   SITE PHYSICAL DESCRIPTION ............................................................... 7

      3.3.1.   Facility Drainage Area ..................................................................... 8

      3.3.2.   Parking Lot Drainage Area .............................................................. 8

      3.3.3.   Site Map ........................................................................................... 9

   3.4.   POTENTIAL POLLUTANTS .................................................................... 11

   3.5.   NARRATIVE DESCRIPTION OF POTENTIAL POLLUTANT SOURCES ............. 11

      3.5.1.   Inventory of Materials and Chemicals ........................................... 11

      3.5.2.   Significant Spills or Leaks .............................................................. 11

      3.5.3.   Non-Stormwater Discharges .......................................................... 11

      3.5.4.   Erosion ........................................................................................... 12

   3.6.   ASSESSMENT OF POTENTIAL POLLUTANT SOURCES AND
CORRESPONDING BEST MANGEMENT PRACTICES (BMPS) ....................... 12

4.   **BEST MANAGEMENT PRACTICES** ................................................................ 16

   4.1.   SOURCE CONTROLS .......................................................................... 16

4.1.1.    Spill Prevention...................................................................................... 16

4.1.2.    Sweeping................................................................................................ 17

4.1.3.    Preventative Maintenance ...................................................................... 17

4.1.4.    Material Loading, Unloading, and Access Areas ................................... 17

4.1.5.    Methods of Disposal of Waste Materials................................................ 18

4.1.6.    Employee Training.................................................................................. 18

4.1.7.    Housekeeping......................................................................................... 20

4.1.8.    Inspections and Record Keeping ........................................................... 20

4.2.    STRUCTURAL CONTROLS......................................................................... 21

4.3.    BMPS FOR SPECIFIC AREAS ..................................................................... 22

4.3.1.    Daily Clean Up of Paved Areas............................................................. 22

4.3.2.    Crush Pad Area ...................................................................................... 22

4.3.3.    Customer Yard ....................................................................................... 23

4.4.    QUALITY ASSURANCE ............................................................................... 23

5.    MONITORING AND REPORTING REQUIREMENTS ............................................ 24

5.1.    MONITORING AND REPORTING PRACTICES ....................................... 24

5.2.    STORMWATER SAMPLING ........................................................................ 24

5.3.    SUMMARY OF EXISTING STORMWATER SAMPLING DATA ........................... 25

5.4.    SUBSTANTIALLY SIMILAR OUTFALL DETERMINATION ................................. 25

5.5.    ANNUAL INSPECTIONS .............................................................................. 25

5.6.    ADDITIONAL SWPPP SUBMITTAL REQUIREMENTS.......................................... 26

6.    CERTIFICATION OF SWPPP........................................................................................ 27

**FIGURES**

**Site Map**  (page 10)


**APPENDICES**

**Appendix 1:**  DRAIN INLET BMP DIAGRAM

**Appendix 2:**  STORMWATERX CLARA 90C SCHEMATIC

**Appendix 3:**  STORMWATERX FILTRATION TREATMENT SYSTEM SCHEMATIC

## 1.1.  DEFINING THE STORMWATER ISSUES

Managing stormwater poses two different, important problems: handling stormwater quantity and protecting stormwater quality. With the development of the National Pollutant Discharge Elimination System (NPDES) stormwater regulations under the federal Clean Water Act, attention has been given to preventing and minimizing stormwater pollution to insure stormwater quality. This is emphasized through the required implementation of stormwater pollutant control measures known as best management practices (BMPs).

Stormwater may become contaminated when it comes into contact with pollutants on exposed surfaces of the facility. Pollutants may dissolve, become suspended, or float on the surface of stormwater runoff. Stormwater runoff at Pick-n-Pull's Sacramento facility may come into contact with equipment, salvage cars, automobile parts, exposed soils, and other industrial areas of activity exposed to rain. Pick-n-Pull recognizes that such materials and activities at exposed areas may potentially affect stormwater quality. Potential pollutants that have been identified for the facility include petroleum hydrocarbons, certain heavy metals, and suspended solids. To address how Pick-n-Pull will prevent and control these potential pollutant sources at the Site, this Stormwater Pollution Prevention Plan (SWPPP) was developed and will be implemented as required.

## 1.2.  STORMWATER POLLUTION PREVENTION PLAN OBJECTIVE

This SWPPP was written for the Sacramento Pick-n-Pull facility located at 7600 Stockton Boulevard, Sacramento, Sacramento County, California (Site). Pick-n-Pull has prepared this SWPPP in compliance with the California State Water Resources Control Board (SWRCB) NPDES General Permit No. CAS000001 Waste Discharge Requirements (WDRs) For Discharges of Stormwater Associated With Industrial Activities (General Permit). This SWPPP includes structural and non-structural BMPs that are intended to eliminate and/or reduce pollutants from entering stormwater runoff to the extent practical. Pick-n-Pull will implement and maintain the Site-specific BMPs identified herein to comply with the provisions of the General Permit. These chosen BMPs are the Best Available Technology Economically Achievable ("BAT") and the Best Conventional Treatment Technology ("BCT"). These BMPs will address Site-specific conditions at Pick-n-Pull's Sacramento facility. Additional BMPs, modifications, or replacement of existing BMPs will be evaluated on a routine basis and this SWPPP will be updated should any changes regarding the current BMPs be made. Updates to this SWPPP will be logged in the SWPPP Revision History table located on page i of this SWPPP.

This SWPPP has two major objectives:

1. To identify and evaluate sources of potential pollutants associated with Site-specific industrial activities that may affect the quality of stormwater discharges from the facility; and

2. To identify and implement specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater discharges and to provide practical guidance to the operator to assist in their implementation and maintenance.

This SWPPP is a living document. As the operations of the facility change and as additional information is gained regarding the control of stormwater pollutants at the Site, this SWPPP will be updated accordingly. At a minimum, this SWPPP will be reviewed annually and updated as necessary under the following circumstances:

- As requested by the Central Valley Regional Water Quality Control Board (RWQCB) to meet minimum requirements of the General Permit.
- Prior to changes in industrial activities at the Site that may significantly increase the quantities of pollutants in stormwater discharge from the Site, cause a new area of industrial activity to be exposed to stormwater, or introduce new pollutant source to the Site.
- Changes in contact information and other facility changes that should be reflected in this SWPPP.

A current copy of this SWPPP will be maintained onsite at all times and made available to agency representatives upon request.

## 2. PLANNING AND ORGANIZATION

### 2.1.   STORMWATER POLLUTION PREVENTION TEAM

In accordance with the requirements of the General Permit, James Smith, Store Manager; Andres Ospina, Production Manager; Sherman Asberry, Sales Manager; and the Pick-n-Pull Corporate Management (Regional VP and Regional Director) and Environmental Health and Safety Department (Regional EHS Engineer and Environmental Engineer) will serve as the Pollution Prevention Team for the Sacramento facility. This team is responsible for developing, implementing, maintaining and revising this SWPPP. The respective responsibilities are summarized as follows:

- **Store Manager:** The Store Manager will be primarily responsible for ensuring that the requirements of the SWPPP are properly implemented and maintained at the facility. This includes ensuring that BMPs are properly installed, maintained, inspected and evaluated as needed; proper training is provided to applicable employees; inspections are performed in accordance with this SWPPP; and documents and records are properly filed and maintained. The Store Manager will also be responsible for ensuring that stormwater samples are properly collected.

- **Production Manager:** The Production Manager will assist the Store Manager with ensuring that this SWPPP is properly implemented. They will assist with BMP implementation and maintenance. They will share in the responsibilities for conducting routine stormwater inspections and stormwater sample collection, and other responsibilities as designated by the Store Manager.

- **Sales Manager:** The Sales Manager will assist the Store Manager with ensuring that this SWPPP is properly implemented. They will share in the responsibilities for conducting routine stormwater inspections and stormwater sample collection, and other responsibilities as designated by the Store Manager.

- **Regional EHS Engineer/Environmental Engineer:** The Regional EHS and Environmental Engineers will work with facility and corporate management to ensure that stormwater BMPs have been properly implemented and maintained. They will provide technical assistance as needed to ensure compliance with the General Permit. They will assist the Site with properly evaluating the need for additional BMPs and/or BMP modifications. They are responsible for assisting facilities with sample collection, training and annual reporting requirements. They are also responsible for completing and/or assisting with EHS Site compliance reviews/audits.

- **Corporate Management** (Regional VP and Regional Director): The Regional Director and as necessary, the Regional VP, will be responsible for ensuring the facility meets Pick-n-Pull stormwater management policy and regulatory requirements. Corporate Management is involved as necessary with the approval of larger capital improvement projects related to stormwater.

3

## 2.2   REVIEW OTHER PLANS

Pick-n-Pull's Sacramento Site has developed and implemented additional environmental programs that can also assist in the proper management of stormwater in conjunction with this SWPPP. Other environmental programs implemented at the facility that coincide with this SWPPP include the Pick-n-Pull Hazardous Material Business Plan (HMBP), Spill Prevention Control and Countermeasure (SPCC) Plan, and Pick-n-Pull's Contingency and Evacuation Plan (also referred to as the Emergency Action Plan, EAP). These plans are maintained onsite in the manager's office. Copies of these plans can be made available by request.

In addition, California Pick-n-Pull facilities are part of a stormwater monitoring group known as the California Auto Dismantlers Group (CADG), which is managed by Environmental Compliance Management Services (ECMS). The CADG stormwater monitoring group was developed and managed in accordance with the General Permit requirements and approved by the SWRCB. Pick-n-Pull's stormwater monitoring practices are described in the CADG Participants Group Stormwater Management Program (GSMP) Manual and Stormwater Pollution Prevention Plan (updated annually by ECMS). Under CADG participant requirements, specific BMPs are also required to be implemented and maintained by all members of the CADG and are implemented by Pick-n-Pull in addition, and in conjunction with the BMPs specified in this SWPPP. Please refer to the GSMP Manual & SWPPP for forms and CADG specifics regarding the stormwater monitoring and sampling practices at the Site.

**3. ASSESSMENT**

## 3.1.   SITE LOCATION

Pick-n-Pull's Sacramento facility is located at 7600 Stockton Boulevard in the City of Sacramento, California.   The Site is bounded to the north by residential and commercial properties, to the south by residential mobile home park, to the east by Stockton Boulevard, and to the west by a bus and mobile home storage lot.  The Site property is approximately 15 acres in size and is situated in a mixed residential and commercial area of Sacramento.  The nearest surface water body is Elder Creek located across of Stockton Boulevard to the east and within 200 feet South of the Site, just past the neighboring mobile home park.

## 3.2.   INDUSTRIAL PROCESSES

Pick-n-Pull's Sacramento facility is a self-service, auto dismantling operation where customers pay for used car parts, which they remove themselves from a selection of salvage cars.  Site operations include: draining fluids from new arrival cars, including gas, oil, and radiator fluid; mounting cars on stands in the Customer Yard for customer access; removing radiators and cores from picked-over cars; crushing vehicle bodies prior to transport to a metals recycling facility; and loading core parts and tires onto separate trucks for off-site recycling.  A small number of used cars, batteries, and tires are also sold at the Site.  In general, most industrial Site activities such as shipping, receiving, material storage, de-garbaging, vehicle draining, and vehicle crushing are done within the Production Yard area of the Site.  Customer activities such as car part pulling and sales are done within the Customer Yard and Sales Area.

### 3.2.1.  Vehicle Receiving

Used vehicles are received just north of the Office and Vehicle Purchasing Office Building (Office/VPO) at the northeast area of the property.  Once received and entered into Pick-n-Pulls database system, the vehicles are transferred directly to the De-Garbage Area just west of the building.

### 3.2.2.  Vehicle De-Garbaging

When the vehicle is approved/ready to be processed, the vehicle is transferred to the De-Garbage Area where they are removed of the car battery, refrigerant (freon), vehicle fluids, and general debris such as paper, trash, and other such items left in the vehicle by the previous owner (i.e. "de-garbaged").   Trash is sorted and placed in appropriate containers and used batteries are properly stored for recycling and/or resale.  Waste storage containers are transferred into the Drain Building at the end of every production day for covered storage.  Miscellaneous items left in vehicles that can be reused are sold to customers at the thrift store section of the Sales Area.

5

### 3.2.3.  Vehicle Draining

Vehicle fluids such as oils and antifreeze are removed from the vehicle after they have gone through the de-garbaging process.  Vehicle fluid draining activities are done within the covered and paved Drain Building located west of the VPO Building.  The Drain Building and immediately surrounding area is entirely paved.

Received vehicles are placed on raised racks for worker safety and process efficiency.  The vehicle fluids are drained into separate systems of funnels and piping into tanks specified for the type of fluid drained.  Vehicle fluid storage tanks are stored under cover within the Drain Building and provided with secondary containment or located within the covered and bermed concrete pad just outside the eastern side of the Drain Building.

Within the Drain Building, used oils and antifreeze are stored in 275-gallon polyethylene totes.  Fuel storage tanks are located on the bermed concrete pad and are double walled tanks.  The Site has two 1,000-gallon gasoline tanks and one 1,000-gallon diesel tank.  Gasoline is recycled offsite by a qualified contractor.  Diesel fuel is used to fuel site equipment.  Equipment fueling activities are conducted on the paved area adjacent to the diesel tank storage area.

On the very rare occasion that the facility must process an oversized vehicle (motor home), a portable outdoor rack is set up on the paved area just outside the drain building.  When this occurs, draining of oversized vehicles is only done when it is not raining or predicted to rain.

### 3.2.4.  Customer Yard

Once vehicles have been properly drained, they are set out in the Customer Yard, which occupies the majority of the Site property.  The Customer Yard is an impervious area lined with gravel and is where customers can access displayed vehicles in order to pick and pull their part(s) for re-use.

There is an unused buffer zone area along the southern border of the Customer Yard (See Site Map).  A portion of this area is paved and may have been a former driveway and/or walkway area.  This buffer zone area is fenced off from the rest of the facility property and not used by the Site.

### 3.2.5.  Crush Pad Area

Once vehicles have been picked over, the vehicle is then pulled from the Customer Yard and taken to the Crush Pad Area located west of the Drain Building.  The vehicles are removed of core parts and wiring prior to being crushed.  The vehicle is then crushed and either temporarily stored just west of the Crush Pad Area until it is ready for shipment, or directly loaded onto a flatbed truck for offsite shipment to a metal recycling facility.

Material storage bins are stored within the paved Crush Pad Area. These bins are covered with tarps when not in use and when rain is expected to prevent material contact with storm water. A roofed area where used tires are stored is also located in the paved Crush Pad Area.

### 3.2.6.  Bay Wash Station

A Bay Wash Station is located between the Warehouse and the De-Garbage Area. Large equipment is washed once a week as part of the Site's routine maintenance practices. The truck wash station is a paved concrete pad area with a drain inlet that leads to a sump directly below the wash pad. Wash water is pumped to the City sewer system and is not discharged to the site stormwater drainage system. The Bay Wash sump is cleaned out twice a year for proper maintenance.

### 3.2.7.  Office and Sales Buildings

A former office building is located at the northeast corner of the property and north of the VPO. The building is no longer used for administrative purposes and is used primarily for material storage, maintenance purposes and waste/used tire processing. Archived records, scrap materials, supplies, used batteries, oils, and equipment are stored in the building referred to as the Warehouse. Some routine equipment maintenance is also performed under cover within the Warehouse. The westernmost part of the building consists of an area where tires are processed (e.g. separated from rims).

The Sales Area is a paved area located at the customer entrance and exit. Admission transactions are done within the small Greeters Booth and sales are done within the Office/VPO building. The Sales Area also consists of items for resale such as used tires, batteries and miscellaneous items from vehicles (books, clothes, toys, etc.) that are displayed under roofed cover.

The Sacramento Pick-n-Pull facility is a certified Used Oil Collection Center by the California Department of Resources Recycling and Recovery (CalRecycle). This program provides members of the public a means to responsibly and properly recycle their used oil from their households. A used oil drop off area (100-gallon plastic tote container) for customers is located under a covered awning at the south side of the Office/VPO Building. Absorbents and spill response material is stored nearby to address minor spills by customers.

### 3.2.8.  Parking Area

The Parking Area is located along the eastern side of the Site property. No industrial activity occurs in this area and customers are prohibited from doing any work/repairs on their vehicles in the parking lot.

## 3.3.    SITE PHYSICAL DESCRIPTION

Pick-n-Pull's Sacramento Site encompasses approximately 14.5 acres. The overall Site topography is generally flat and is located in a mixed commercial and residential area of

Sacramento. The Site is approximately 27 percent impervious. Impervious areas comprise approximately 3.8 acres (buildings, roofed areas, associated paved areas, and parking areas), approximately 2 acres of which is the Parking Area. Approximately 8.8 acres comprise of the pervious gravel Customer Yard where vehicles are displayed for customer access. The rest of the pervious areas comprise of the gravel Holding Area, De-Garbage Area and landscaping areas.

A total of two drainage areas have been identified for the Site, the Facility Drainage Area and the Parking Lot Drainage Area. Currently, there is only one industrial discharge point for the entire Site, Outfall #1, which drains treated stormwater runoff from the Facility Drainage Area. The Parking Lot Drainage Area drains the runoff generated within the Parking Area only and does not discharge stormwater that is exposed to industrial Site activities. A more detailed description of the drainage areas and associated BMP controls is provided below.

### 3.3.1. Facility Drainage Area

The Facility Drainage Area consists of drainage for the entire Site, except for the Parking Area of the Site. The Facility Drainage Area has been designed to direct stormwater to only one discharge point referred to as Outfall #1. Outfall #1 is located at the northeast corner of the property and is the outlet port of the stormwater filtration treatment system. A soil and gravel berm and a berm of sandbags were implemented to prevent runoff from draining along a portion of the southwest border of the Site. Stormwater that does not infiltrate into the permeable areas of the Site is directed toward a series of protected drain inlets and then through a series of passive and active treatment systems before it is discharged offsite (See Section 3.3.3).

Each drain inlet is protected at minimum, with all or a combination of filters, oil absorbents, and straw wattles (see Appendix 1). Stormwater runoff is then directed to two stormwater interceptors, a four-stage clarifier, and then to a filtration treatment system prior to discharge offsite. Treated stormwater runoff is discharged into the City of Sacramento's Municipal Separate Storm Sewer System (MS4). It is assumed that the MS4 then conveys stormwater to nearby Elder Creek, located to the east and south of the Site. The addition of these structural BMPs address sediment and pollutant removal from stormwater runoff before it leaves the Site property.

All Site industrial activity occurs within the Facility Drainage Area. The majority of industrial activity is done within covered building areas and/or paved impervious areas to limit stormwater exposure to potential pollutant sources.

### 3.3.2. Parking Lot Drainage Area

Stormwater runoff from the Pick-n-Pull paved Parking Area is directed to drain inlets located within the Parking Area as shown on the Site Map provided in Section 3.3.3 below. The drains are connected in series and eventually discharge offsite from the northern most Parking Area drain inlet. Stormwater runoff from the Parking Area that do not enter the Parking Area drain

inlets drain through weep holes located along the curbed landscaping area at the eastern border of the Site property.  The weep holes direct stormwater runoff to a small drainage ditch along the sidewalk and then to the City MS4.

Stormwater runoff that discharges from the Parking Lot Drainage Area is not exposed to Pick-n-Pull industrial activities.  The discharges from this drainage area are not industrial discharge points and are not required to be sampled or maintained under the General Permit.  However, Pick-n-Pull has incorporated the following pollution prevention and stormwater BMPs for the Customer Parking Area as added stormwater protection measures:

- Pick-n-Pull has made it policy that customers are forbidden from removing parts from their vehicles, making vehicle repairs, or performing other such activities in the Parking Area that may cause pollutants to enter stormwater.
- Signs have been posted in the Parking Area to indicate this customer restriction and remind customers of Pick-n-Pull policy.
- Site staff is directed to instruct customers to cease these types of activities when observed.
- Site staff performs daily housekeeping to remove trash and debris left by customers on a daily basis.
- Twice a month a vacuum sweeping company sweeps the Parking Area.
- Drain inlets are protected with drain filters and oil absorbents to minimize pollutants from customer vehicles.

### 3.3.3.  Site Map

A Site Map provided below shows the following features of the Pick-n-Pull Sacramento Site:

- Stormwater conveyance and discharge structures including: subsurface stormwater piping, drain inlets, aboveground drainage flow directions/patterns, stormwater interceptors (Jensen boxes), and stormwater treatment system locations
- An outline of the identified drainage areas
- Paved areas and building structures (impervious areas)
- Areas of potential pollutant contact (i.e. potential pollutant sources/industrial activity areas)
- Locations of existing stormwater structural controls and BMPs
- Nearby surface water locations (there are no such locations on the Site property)
- Areas of existing and potential soil erosion (there are no such locations at this Site)
- Vehicle service areas
- Locations of major operating equipment, material storage areas, and access roadways
- Pervious and landscaped areas
- Neighboring property uses

9

# SITE MAP
## Sacramento Pick-n-Pull



## KEY

| | | | | |
|---|---|---|---|---|
| Building/Awning/Covered Area | Gas Storage Area | Freon Storage Area | Protected Drain Inlet | Truckwash Pump |
| Paved/Impervious Area | Diesel Storage Area | Battery Storage Area | Stormwater Interceptor | Truckwash Station/Pad |
| Vegetation/Landscaping Area | Used Oil & Antifreeze Storage Area | Tire Storage Area | Sand Filter Treatment System | Parking Lot Drainage Area Boundary |
| Main Pathway | Oil Storage Area | Crusher | 4-Stage Clarifier | Facility Drainage Area Boundary |
| Interior Fence | Brake Fluid Storage | Material/Waste Storage Bin | Sandbag Berm | Concrete Berm |
| Boundary Fence | Spill Response Material/Kit | Mercury Switch Storage Area | Gravel and Soil Berm | |
| | | | Surface Flow Direction | |
| | | | Subsurface Conveyance Direction | |

7600 Stockton Blvd
Sacramento, CA 95823

10

## 3.4.   POTENTIAL POLLUTANTS

The following pollutants have a reasonable potential to be present in stormwater discharge from the Site:

- Total suspended solids (TSS)
- Oil and grease (O&G)
- Heavy metals (aluminum (Al), copper (Cu), iron (Fe), lead (Pb), and zinc (Zn))
- Brake fluid and other hydraulic fluids in vehicles (i.e. O&G)
- Gasoline and diesel fuel (O&G, petroleum hydrocarbons)
- Antifreeze/coolant (i.e. ethylene glycol)
- Specific Conductance/Electric Conductivity (EC)
- Corrosive materials (acids & bases, pH)

## 3.5.   NARRATIVE DESCRIPTION OF POTENTIAL POLLUTANT SOURCES

### 3.5.1.   Inventory of Materials and Chemicals

Storage of materials can be a source of potential pollutants if not managed, handled or stored properly.  Materials and chemicals managed, and/or stored onsite that are potential pollutant sources primarily include petroleum products, anti-freeze, and scrap metals.  Handling, storage and management of these materials and chemicals are done by qualified and properly trained employees to minimize and/or eliminate materials and chemicals at the Site from entering stormwater.

Details regarding the inventory of bulk hazardous chemicals and hazardous wastes are provided in the Site HMBP Plan.  The HMBP Plan is maintained onsite for reference.  The storage locations, proper handling and management procedures for the listed chemicals are provided in the HMBP Plan.  Spill response procedures associated with these materials and chemicals are also provided in the HMBP Plan.

### 3.5.2.   Significant Spills or Leaks

Significant spills or leaks can be a potential pollutant source should it not be properly cleaned up. Pick-n-Pull is not aware that any significant spills or leaks of toxic or hazardous pollutants have ever occurred at the Site.  This includes spills of toxic chemicals, oils, fuels, and other hazardous substances in reportable quantities.

Should a significant chemical spill or leak occur at the Site, this section will be updated accordingly to document and identify the type of material and a description of the spill area.

### 3.5.3.   Non-Stormwater Discharges

Pick-n-Pull's Sacramento facility has been inspected to identify all potential sources of non-stormwater discharges, including authorized and unauthorized discharges as defined by the General Permit.  During routine inspections, all authorized discharges are monitored to ensure

they are free of pollutants. Authorized discharges that are most likely to occur at the facility include equipment condensate and irrigation for landscaping. However, landscaping irrigation has currently ceased for water conservation purposes and equipment condensate has not been observed to discharge offsite or enter the Site stormwater drainage system. Other types of authorized discharges such as groundwater and water discharged to fight a fire would be rare and unlikely occurrences at the Site.

There are no unauthorized non-stormwater discharges that occur at the Site. To ensure that no prohibited non-stormwater discharges occur, routine Site inspections are conducted at the Site. "Dry" inspections are conducted at least monthly, to insure that all prohibited non-stormwater discharges remain eliminated. Measures to eliminate all prohibited non-stormwater discharges shall be taken upon discovery/identification. Descriptions of monitoring and inspection procedures performed at the Site are provided in the GSMP Manual and Section 5 of this SWPPP.

### 3.5.4. Erosion

The majority of the Site property is unpaved and permeable. The Site property has been graded with a flat to shallow slope such that erosion is prevented and/or minimized. Currently, there are no areas of erosion or potential areas of erosion that have been identified on the Site. Use of hay bales, straw wattles, and rip-rap will be used to minimize minor erosion should areas of erosion get identified, and as needed.

Minor erosion due to wind is addressed as needed by use of a water buffalo for dust control. Water will not be applied in excess as to cause runoff from entering storm drains or discharging offsite.

## 3.6.   ASSESSMENT OF POTENTIAL POLLUTANT SOURCES AND CORRESPONDING BEST MANGEMENT PRACTICES (BMPS)

A summary of identified potential pollutant sources by associated industrial activity is provided in the table below. Corresponding minimal BMPs required to address these potential pollutant sources is also provided. A narrative description of identified pollutant sources is provided in Section 3.5 above. Further description of potential pollutant sources and BMP requirements are provided in the GSMP Manual, which are also implemented at the Site.

**Potential Pollutant Sources and Corresponding BMPs**

| ACTIVITY/ OPERATION | POLLUTANT SOURCE (ASSOCIATED POLLUTANTS) | BMP |
|---|---|---|
| Fluid Draining | Processed vehicles may leak the following vehicle fluids during fluid draining activities: motor oils, brake fluid, fuels, antifreeze, and windshield wiping fluids (O&G, TSS, pH). | Drain activities are done within covered and impermeable paved areas. |
| | | Spill kits are made readily available and training on spill prevention, control and response is required. |
| | | Proper housekeeping and inspections are done routinely. |
| | | Fluids are stored in proper containers under cover and/or within secondary containment. |
| | | Proper management, storage and handling of fuels and other vehicle fluids is done by qualified and trained staff only. |
| Vehicle De-Garbaging | Materials, wastes and general debris are commonly found in received vehicles. These can become potential pollutant sources and include: batteries, trash, broken parts, containers of motor oil, etc. (O&G, TSS, heavy metals, EC, pH). | Materials and wastes are removed before placement of vehicle in the Customer Yard. |
| | | Only properly trained personnel are assigned the task. |
| | | Proper housekeeping and inspections are done routinely. |
| | | Use of storage bins that are stored indoors overnight and brought under cover of an awning if raining. |
| Parts & Vehicle Storage | Leaking engines/ transmissions/ rear ends/radiators. Customer dismantling activities may be a source of the following pollutants: vehicle fluids and heavy metals. General trash such as soda bottles and snack bags are occasionally left behind by the customer (O&G, heavy metals, EC, TSS). | Vehicles are properly drained and batteries, Freon, and debris are removed, properly stored and managed prior to placing the vehicle in the Customer Yard. |
| | | Vehicle engine hoods are kept closed to extent practical. |
| | | Oily parts are stored undercover by the use of roofed areas, covered containers, and/or tarps. |
| | | Wastes and materials are properly segregated and put in proper containers. |
| | | Proper housekeeping and inspections are done routinely. |
| | | Personnel are properly trained to address spills and leaks, and to perform inspections to address any potential issues. |
| | | Placement of carpeting beneath displayed vehicles is done to capture minor leaks. |
| | | Replacement of stained gravel and soil as needed is done daily. |

| ACTIVITY/ OPERATION | POLLUTANT SOURCE (ASSOCIATED POLLUANTS) | BMP |
|---|---|---|
| | | Drain inlet protection BMPs are implemented at drains located in the area and direct stormwater to treatment prior to discharge offsite. |
| Vehicle Crushing | Residual vehicle fluids and metal parts (O&G, heavy metals, EC, TSS, pH). | Proper housekeeping and inspections are done routinely. |
| | | A portion of the Paved Crush Pad Area is bermed to control stormwater surface flow and direct it to protected drain inlets and treatment (interceptors, clarifier and filtration treatment system). |
| | | Proper draining of fluids is done prior to crushing activities to minimize amount of fluids leaking from cars during crushing activities. |
| | | Use of drip pans/buckets to capture oils from vehicles/crusher. |
| | | Drain inlet protection BMPs are implemented at drains located in the area. |
| | | Personnel are properly trained to address spills and leaks; spill response material is located nearby. |
| | | Paved areas are routinely swept to minimize debris from entering drainage systems. |
| Hazardous Materials/ Waste Management | Likely potential sources are from the handling and storage of the following materials: used oils, fuels, antifreeze, scrap parts, oily debris, trash, and universal wastes (O&G, heavy metals, TSS, pH). | Personnel are properly trained to manage and handle hazardous material and wastes. |
| | | HMBP Plan implementation. |
| | | Hazardous materials and wastes are stored within buildings, on paved surfaces, in closed/covered containers, and properly labeled. |
| | | Proper housekeeping and inspections are done routinely. |
| Equipment & Site Maintenance | Activities associated with equipment, and general facility maintenance/ housekeeping activities may contribute as potential sources of: dirt/dust, oils, fuels, and oily debris (O&G, TSS). | Non-storm water discharges are prohibited. |
| | | Personnel are properly trained to address spills and leaks, and to perform routine inspections to address any potential issues. |
| | | Equipment maintenance activities are done under cover and/or at the Bay Wash Station where any wash water, spills and debris are captured into a sump. |

| ACTIVITY/ OPERATION | POLLUTANT SOURCE (ASSOCIATED POLLUANTS) | BMP |
|---|---|---|
| | | Routine equipment maintenance and daily inspections are performed to prevent and identify potential leaks. |
| | | Spill prevention program/SPCC Plan has been implemented. |
| | | Materials (oils, grease, wastes, etc.) are properly stored undercover and provided with secondary containment as needed. |
| Vehicle & Equipment Fueling | Spills & leaks during delivery; spills caused by topping off fuel tanks; and leaking storage tanks or piping may contribute the following pollutants: fuels (O&G). | Employees are trained on proper fueling & spill response procedures. |
| | | Proper housekeeping and inspections are done routinely. |
| | | Fuel transfers are done by qualified contractors only. |
| | | Fuels are stored in double-walled tanks with additional bermed secondary containment and storage area is paved. |
| Customer Activity | Customers create spills, leaks, and leave car hoods open, car parts exposed, and general trash and debris behind (O&G, heavy metals, pH, EC, and TSS). | Hoods are closed (or engine compartments covered) as seen by employees. |
| | | Proper housekeeping and inspections are done routinely to identify and correct any issues. |
| | | Signs are posted in Parking Area to remind customers not to pollute and to prevent leaks and spills. |
| | | Spill response materials are provided in the Customer Yard for customer use. |
| | | Garbage cans are located throughout the Customer Yard for customer convenience. |
| | | Drain inlet protection BMPs are implemented at drains located in the Customer yard and direct runoff to treatment prior to discharge. |
| | | Drain inlets in the Parking Area are protected with filters, wattles and/or oil absorbents to limit pollutants from customers. |
| | | Staff has included the Parking Area as part of their daily housekeeping and inspection schedule. |
| | | Customers are prohibited from littering and working on their vehicles in the Parking Area. |

# 4. BEST MANAGEMENT PRACTICES

Best Management Practices (BMPs) are controls that will be implemented to effectively reduce the potential for pollution associated with stormwater runoff at Pick-n-Pull's Sacramento facility. There are two general categories of BMPs, Non-structural Source Controls and Structural Controls, which are described below.

In addition, the Pick-n-Pull Sacramento facility participates in group monitoring under the CADG managed by ECMS. By participating in this monitoring group, Pick-n-Pull is held to certain requirements regarding BMP implementation and management; stormwater monitoring and inspections; and stormwater sampling. These requirements and description of this program are provided in the GSMP Manual. A copy of the group monitoring manual is maintained onsite and may be available upon request.

## 4.1. SOURCE CONTROLS

Source Controls, or operational and management practices, that eliminate or minimize potential contact with pollutants; also includes elimination of non-stormwater discharges from improper connections and dumping into surface waters. In the NPDES regulations, source controls are also referred to as non-structural controls. Non-structural/source controls implemented at the site are described below.

### 4.1.1. Spill Prevention

Spill prevention, control and response programs are in place at the Site as described in this Section and in accordance with the Site SPCC Plan, EAP, HMBP and GSMP Manual. These plans may be referred to for further detail.

Materials could potentially spill into or otherwise enter the stormwater conveyance systems and their accompanying drainage points. These materials will be handled in such a manner as to avoid spills or leaks. Preventive measures include regularly maintaining and inspecting of vehicles for leaks, and storing materials in their proper containers. Vehicle fluids will continue to be stored in covered and/or bermed areas to avoid contact with rainfall and stormwater runoff, and to contain spills and leaks as they occur. Site security will be maintained to prevent vandalism.

Appropriate absorbent material and spill response kits are stored at areas where chemical materials are stored or handled for proper spill response and cleanup. Only dry cleanup measures are used. Visible leaks from tanks, pumps, containers or vehicles will be immediately contained, repaired and corrected as discovered.

Pick-n-Pull has retained 3E MSDS Company to provide Material Safety Data Sheets (MSDS) and Emergency Spill Response Coordination for significant spills. Their number is: 1-800-451-8346. They are available 24 hours per day, 365 days per year.

16

The RWQCB and the National Spill Response Center will be contacted should a significant spill of oils, fuels, toxic or other hazardous materials occur:

> **Regional Water Quality Control Board**
> **Central Valley Division**
> 3443 Routier Road
> Sacramento, CA  95827-3098
> (916) 361-5600
>
> **National Spill Response Center**:  1-800-424-8802

At a minimum, spill kits that contain all or a combination of oil booms, absorbent pillows, oil pads, and other absorbent material must be kept in the De-Garbage Area, the Crush Pad Area, Drain Building and at the customer Used Oil Collection Center area.  Employees are trained on the proper use of the spill kits as part of their orientation upon hire and at least annually.

### 4.1.2. Sweeping

The Site maintains a routine schedule of sweeping paved areas at least twice a week within the production areas using a mechanical sweeper.  During sweeping activities, swept debris and materials are prevented from entering nearby drain inlets.

### 4.1.3. Preventative Maintenance

**Equipment Maintenance:** Routine equipment maintenance activities take place undercover within the warehouse or outside on a concrete pad at the Bay Wash Station.  Motor oil needed to keep the equipment properly maintained is stored in its proper containers either within the Warehouse or within the bermed concrete pad east of the Drain Building.  Only properly trained and qualified employees and/or contractors perform equipment maintenance.  Maintenance and repairs are done as recommended by the manufacturer to prevent/minimize leaks.

**Stormwater Structural BMP Maintenance:**   Maintenance of Site structural BMPs is performed as needed and on a routine basis.  Interceptors and the clarifier are cleaned out at least two times a year to clear debris, maintain system efficiency, and maintain pollutant removal effectiveness.  Maintenance on the filtration system is done as needed based on visual inspection observations.  Routine maintenance of the filtration treatment system is also done in accordance with manufacturer recommendations.  Secondary berms are inspected frequently for integrity and repaired promptly if needed.  Drain inlet filters, straw wattles, and oil absorbents are replaced as needed based on routine visual inspections performed by qualified staff.

### 4.1.4. Material Loading, Unloading, and Access Areas

Material loading/shipping and unloading/receiving areas are primarily located at the eastern side of the Property and are described as follows:

- New arrival vehicles are placed in the De-Garbage Area for general removal of items such as batteries, coolant, and debris prior to being processed for vehicle fluid draining.
- Crushed vehicles are temporarily placed within and adjacent to the Crush Pad Area prior to being loaded onto flatbed trucks for shipment offsite.
- Materials and supplies are received at the production gate entrance/exit of the facility just north of the VPO Building.
- Materials are stored in their respective designated work areas where the material is to be used. Surplus materials are typically stored in the Warehouse.
- Used oils, fuels, and antifreeze are directly pumped/gravity fed into their designated storage containers located within the Drain Building or just outside of the Drain Building. Qualified vendors/ contractors directly remove the materials from the respective tanks/containers for offsite recycling or disposal.

Customers remove parts from vehicles within the Customer Yard and purchase them in the Sales Area located at the customer entrance/exit of the Site. Customer returns also occur in the Sales Area. As a participant of the California Used Oil Collection Center Program, the Site provides a used-oil drop off area for customers in the Sales Area near the Site entrance/exit. Customers place small quantities of their used oil into the plastic tote container that is provided with secondary containment and stored under cover.

### 4.1.5. Methods of Disposal of Waste Materials

Waste oils, antifreeze, diesel and gasoline are drained into tanks with secondary containment; they are collected regularly by a qualified contractor for off-site recycling.

Non-hazardous wastes are disposed of in designated trash bins/containers. Containers stored outside are covered at the end of the day and when not in use. Non-hazardous wastes are disposed of by municipal waste services.

Generated hazardous waste materials are placed in their proper containers and stored indoors and/or provided with a lid. Liquid hazardous wastes (e.g. bad gasoline) are stored in totes or drums and provided with secondary containment. Universal hazardous wastes are separated accordingly and placed in their appropriate containers. All hazardous wastes are handled, stored and managed by trained personnel and in accordance with all applicable regulations. All hazardous wastes are shipped for offsite disposal or recycling by qualified vendors under manifest. Manifest records are maintained onsite.

### 4.1.6. Employee Training

Stormwater pollution can originate from a variety of sources and activities at Pick-n-Pull. Effective management of stormwater pollution will require all facility staff to be alert to conditions that may cause stormwater pollution. Furthermore, day-to-day cooperation with and

18

careful adherence to water quality best management practices on the part of all employees is essential for the success of this SWPPP.

The training program shall include use of training materials needed for effective implementation of the training program and training records shall be maintained. The Store Manager is responsible for ensuring that their staff is familiar with the requirements of this SWPPP and understands the overall stormwater management program for the Site. Stormwater management practices and information will be reviewed with all new employees within their first week of employment and at least once annually for all employees. Stormwater training will address:

- Requirements of this SWPPP and the General Permit
- Spill Response and Reporting Procedures
- Pick-n-Pull Requirements and Expectations of good housekeeping
- Material Management Practices
- Proper fuel storage and handling procedures
- Stormwater Best Management Practices (BMPs)

**Non-Stormwater Discharge Training:** Employees, as appropriate to their particular job descriptions, will be trained on the General Permit's prohibition of non-stormwater discharges, so that employees know what non-stormwater discharges are and how to detect and prevent them.

**BMP Training:** Employees, as appropriate to their particular job description, will be trained on stormwater BMP implementation and maintenance to ensure that BMPs are implemented effectively to prevent or minimize the exposure of pollutants to stormwater, to prevent or minimize the discharge of contaminated stormwater, and to ensure the proper treatment of stormwater at the facility.

**Sampling Training (for those that will perform sampling):** The Store Manager shall be responsible for ensuring the proper collection of stormwater samples as required by the General Permit and in accordance with the GSMP Manual. The training shall review the proper sampling protocols, including chain of custody requirements, to ensure stormwater samples are properly collected and submitted to a State certified laboratory.

**Visual Observation Training (for those that will perform visual observations):** Designated employees shall be provided training to be able to properly perform stormwater and non-stormwater visual observations pursuant to the General Permit.

Training shall include the use of training materials (written and/or electronic visual aids/presentations) and the Site shall maintain the training records.

19

### 4.1.7.  Housekeeping

Good housekeeping practices are the primary source control BMPs implemented at the Site. Housekeeping is key to maintaining a clean and orderly facility.  Good housekeeping practices prevent stormwater from being exposed to materials and help minimize or eliminate pollutants from entering stormwater runoff.  Housekeeping practices maintained at the Site include:

- Collecting and properly disposing of trash and salvage debris throughout the Site.
- Placing trash receptacles at appropriate locations throughout the facility, and regularly collecting trash for disposal.
- Installing plugs on punctured transmission pans and rear end covers.
- Covering material storage bins/containers during the rainy season.
- Regularly clearing out parts bins, to avoid excessive build-up of oil and grease.
- Maintaining consistent supplies for cleanup activities such as regularly supplying absorbent for dry cleanup of spills at all maintenance and drainage areas.
- Disposing of obsolete equipment, vehicles, surplus materials and other items not required for facility operations.  As these items are generated, measures will be taken to reduce or eliminate exposure of pollutants to stormwater.  This includes covering items, and fluids for proper disposal.
- Promptly cleaning up oil stains in the Customer Yard as identified and if safely accessible.
- Proper storage of materials: organized, sorted, clearly labeled, and placement of materials in designated areas.

Housekeeping logs are maintained at the Site for areas of the Site such as the Drain Building, Crush Pad Area, Customer Yard Area, De-Garbage Area, etc.  A designated employee must confirm housekeeping practices have been followed in accordance with Pick-n-Pull policies. Housekeeping log records are maintained onsite.

### 4.1.8.  Inspections and Record Keeping

Designated personnel will conduct regular visual inspections of the Site for evidence of, or potential for pollutants entering the drainage system.   As determined during the visual inspections, maintenance or other corrective actions will be taken to mitigate any deficiencies. Visual inspections will be documented and maintained at the facility.  Follow-up procedures shall be used to ensure appropriate response(s) are taken for any findings during an inspection. These inspection records shall be retained at the facility for a minimum of five years.   The following inspections are required for the Site:

1) Daily Rain Observations.

2) Monthly Visual Discharge Observations at each point stormwater is discharged from the Site.

3) Monthly Visual Non-Stormwater Discharge Observations at each point where non-stormwater may be discharged from the Site.

20

4) Weekly Baseline BMP Facility Inspection.

5) Annual inspection of the facility perimeter (part of Annual Certification).

6) Bi-annual inspection of stormwater conveyance system and related treatment BMPs and remove from the system any debris or other materials not related to the control and treatment of stormwater (e.g., wood, concrete and other debris) prior to beginning of each Wet Season and again during each Wet Season.

A description of Site inspection requirements is also provided in the GSMP Manual.

## 4.2.   STRUCTURAL CONTROLS

Structural Controls include facilities or devices designed to remove pollutants from stormwater, or minimize volume or rate of runoff. The following list and description of structural control measures have been implemented as part of the Site's physical management of stormwater:

- Stormwater interceptors:
    1) An interceptor addresses stormwater that drains from the paved crush pad area located west of the Drain Building. Stormwater runoff from the Holding Area, west of the Crush Pad area, gets treated by this interceptor.
    2) A second interceptor is located in the paved area in front of the Warehouse storage area. This interceptor accepts stormwater collected from all drain inlets located within the Facility Drainage Area. This interceptor is located downstream of the interceptor in the Crush Pad Area.
- A 5,000 gallon capacity four-stage clarifier (StormwaterRx Clara 90CP) is connected downstream of all the drains and interceptors located within the Facility Drainage Area. A schematic of the StormwaterRX Clara four-stage clarifier system is provided in Appendix 2.
- A filtration treatment system (StormwaterRx Aquip 300SBI) is the final treatment for stormwater runoff that is discharged offsite from the Facility Drainage Area. The filtration treatment system receives stormwater runoff that has been pretreated by the drain inlet protection BMPs, stormwater interceptors, and the four-stage clarifier. Fine particulates and dissolved pollutants are further captured by the enhanced filtration media within the system. A schematic of the treatment system is provided in Appendix 3 and a copy of the O&M Manual is kept with this SWPPP onsite.
- All drain inlets are protected with all or a combination of sediment filters, straw wattles and/or gravel bags, and oil absorbing pillows, oil absorbing booms, and clean gravel. A diagram of this BMP is provided in Appendix 1.
- Sand bags, soil and gravel berms have been placed along a portion of the southern boundary of the Customer Yard to prevent stormwater runoff sheet flow from discharging to the neighboring property.
- Covered areas have been constructed at the Site where applicable to address protection of stormwater from certain industrial activities (e.g. fluid draining areas). These areas are depicted on the Site Map.

- An awning for stored materials in the Crush Pad Area was installed to prevent rain from coming into contact with the potential pollutant sources.
- A concrete berm on the south side of the Crush Pad Area prevents runoff from flowing into the unpaved Customer Yard and directs runoff to the Site drainage system.
- Regular replacement of gravel in the Customer Yard, Hold Area, and De-Garbage Area as it becomes stained or upon replacement of a vehicle row for safety and accessibility.
- Use of scrap carpeting to absorb minor leaks from vehicles displayed in the Customer Yard.
- Flat grading of the Site to prevent erosion, slow runoff flows and properly direct runoff into drain inlets to limit flooding or pooling of stormwater at the Site.
- Truck wash station prevents vehicle/truck tracking of sediment onto the roadways. All wash water is directed to the sanitary sewer and prevents wash water from entering stormwater drainage systems onsite.  The area is also paved to prevent water from coming into contact with Site soils.
- Double-walled gasoline and diesel tanks to contain any leaks that may occur.
- A bermed concrete pad for tank and drum storage to prevent leaks and spills from directly coming into contact with Site soils.

## 4.3.   BMPS FOR SPECIFIC AREAS

### 4.3.1.  Daily Clean Up of Paved Areas

The following activities shall be performed at the paved areas of the Site where industrial activities occur:

- Trash, debris, and loose parts shall be cleaned up at the end of every production day (Monday – Friday).
- Oil leaks/spills shall be contained and cleaned up upon discovery throughout the day.
- Drip buckets and drip pans shall be emptied of fluids when they reach half full and at the end of every production day.

**Sweeping:** Paved ground surfaces in areas within the Production Area shall be swept using a mechanical sweeper (brush attachment on the loader) at least twice a week.  Manual sweeping of smaller areas (such as sweeping of debris and spent absorbents used to address minor spills) shall be done as needed daily.

### 4.3.2.  Crush Pad Area

The following activities/BMPs shall be done for the Crush Pad Area:

- Housekeeping practices shall be maintained in accordance with Pick-n-Pull policies.
- Oil absorbing booms shall be placed near the crusher as needed. The oil absorbing booms shall be changed as often as necessary.
- All core roll off bins shall be tarpped before a predicted rain event.

- Roll off bins shall be surrounded with straw wattles as needed.
- Miscellaneous parts shall be stored off the ground and placed indoors at the end of every day and roofed/tarpped when raining during use. ·
- Drip buckets/pans shall be used to capture oils that may leak from the crusher during crushing operations.
- Drip buckets/pans shall be emptied when half full and at the end of every production day.
- The drain inlets that receive runoff from the Crush Pad Area shall be protected in accordance with Pick-n-Pull drain inlet protection requirements and maintained as necessary.

### 4.3.3. Customer Yard

Exposure of pollutants to stormwater in the Customer Yard will be controlled to the extent practical by implementing and maintaining the following BMPs:

- It is neither practical nor reasonable to ensure that all oil spots can be immediately mitigated at all times. However, a diligent effort shall be made to clean up stains as they are discovered or as soon as practical (during resetting of vehicle rows).
- The gravel, soil or absorbents shall be placed in the appropriate bin (with lid) for proper storage and eventual offsite disposal.
- Scrap carpeting/mats will be placed under vehicles to address minor leaks and shall be re-positioned or replaced as needed.
- Housekeeping activities (trash removal, parts pickup, etc.) shall be done daily.
- Loose car parts shall be placed inside vehicles or brought to the end of the row to be placed in core bins as appropriate during housekeeping activities.
- When pulling a row of cars for crushing, all trash and debris must be cleaned up in that row and carpeting and mats replaced as needed.
- It is neither practical nor reasonable to ensure that all hoods can be closed at all times due to constant customer activity. However, a diligent effort shall be made to keep as many hoods closed as practical throughout the day.
- Before anticipated storm events, assigned staff shall spend additional time to ensure hoods are closed within the Customer Yard.

## 4.4.   QUALITY ASSURANCE

Under the CADG stormwater program, weekly inspections are conducted by the Store Manager and/or their designee. These inspections are monitored by the CADG administrator and the Pick-n-Pull Corporate EHS Department. Occasional inspections are also conducted by the EHS Department to ensure proper implementation of Site stormwater requirements.

# 5. MONITORING AND REPORTING REQUIREMENTS

## 5.1.   MONITORING AND REPORTING PRACTICES

Stormwater monitoring is done to ensure that the Site is complying with the General Permit, ensure stormwater management practices prevent or reduce pollutants in stormwater, BMPs are current, sufficient and well maintained.   Routine monitoring of the Site with respect to its stormwater management program, including CADG monitoring requirements, are as follows:

1. **Monthly Wet inspections:**  The Site will perform a monthly visual inspections and document rain events during the rainy season (October 1st – May 31st) to document the presence of pollutants in stormwater discharges from the Site and address as necessary. Documents shall be maintained onsite.
2. **Monthly Dry Inspections:**  The Site will perform monthly inspections during the dry season (June 1st – September 30th), and document these reviews to check BMPs and ensure no unauthorized non-stormwater discharges are occurring.  The General Permit requires this be done on a quarterly basis at minimum.  However, under the CADG program, this is required to be done monthly.  Documents shall be maintained onsite.
3. **Weekly BMP inspections:**  Under the CADG program, the Site will perform weekly inspections to ensure BMPs are well maintained and properly implemented.  Documents shall be maintained onsite.
4. **Daily Rain Checks:**  The Site shall document any rain events that occur during working hours and within the first hour that discharge from the facility occurs.  Documents shall be maintained onsite.
5. **Stormwater Analytical Monitoring:**  The Site shall collect stormwater samples from discharges that occur during business hours.  Samples will be collected in accordance with the GSMP Manual and sampling schedule of the CADG Monitoring Program.

## 5.2.   STORMWATER SAMPLING

The Site is a member of the California Auto Dismantlers Stormwater Monitoring Group.  This is a group monitoring program approved by the California State Water Resources Control Board. The monitoring group is administered by ECMS.  The Site's sampling plan is located in the GSMP Manual. Please refer to this document for general sampling procedures and plans.  The CADG program administrator decides which sites are sampled in any given monitoring year, so the Site may not be sampled during a particular year.  However, the Site/Stormwater Pollution Prevention Team may collect additional samples outside of the CADG program to obtain additional data to assist in determining the effectiveness of existing BMPs.

A laboratory accredited by the State of California shall analyze all samples collected by Pick-n-Pull.  The laboratory shall use analytical methods adequate to detect the individual contaminants at or below the values as stated in the GSMP Manual.  All samples collected from the Site shall

be delivered to the laboratory to ensure that sample "hold times" are not exceeded for the respective parameter being analyzed for.

## 5.3.   SUMMARY OF EXISTING STORMWATER SAMPLING DATA

Stormwater sample analytical results are submitted to the SWRCB's SMARTS database. A copy of results are kept onsite and with the CADG administrator (ECMS).

## 5.4.   SUBSTANTIALLY SIMILAR OUTFALL DETERMINATION

If discharges of stormwater through two or more outfalls are substantially the same, sampling may be conducted on one of the outfalls. Results may be reported as representative of the discharges from substantially similar outfalls. The SWPPP must include a justification of why the outfalls are substantially similar. The General Permit outlines the following characteristics of each outfall to compare to make the determination of substantially similar outfalls:

1) The industrial activities that occur in the drainage area to each outfall;
2) Significant materials stored or handled within the drainage area of each outfall;
3) The management practices and pollution control structures that occur within the drainage area of each outfall.

Currently, there is only one outfall at the Site and application of the substantially similar outfall determination does not apply to this Site.

## 5.5.   ANNUAL INSPECTIONS

The Store Manager will be responsible for conducting or ensuring that an annual inspection of the Site is completed prior to July 1st of each year. The Store Manager will work together with members of the Stormwater Pollution Prevention Team to identify and address the following:

- Modification or update of the Site Map and/or the SWPPP to reflect current conditions.
- Review monitoring information.
- Verification of potential pollutant sources through visual inspection of the material handling areas for evidence of, or the potential for, pollutants entering the drainage system.
- Evaluate BMPs.
- Verify that source and structural controls have been implemented, are being maintained and are effective in accordance with the SWPPP.
- Confirmation that adequate response and corrective actions have been taken in accordance with findings and recommendations of the previous year's Annual Inspection.

Records documenting significant observations made during the Annual Inspection will be retained as part of the SWPPP for a minimum of five years.

Certification of the facility's compliance with the General Permit will be done after the completion of the Annual Inspection. Annual Inspection and certification will be reported in the Annual Report due to the SWRCB by July 1st of each year.

## 5.6.    ADDITIONAL SWPPP SUBMITTAL REQUIREMENTS

This SWPPP must be retained on-Site at all times. There is no filing requirement associated with this SWPPP but will made available to the RWQCB upon request.

When any part of this SWPPP becomes infeasible to implement by deadlines specified in the General Permit and/or by the RWQCB due to proposed significant structural changes, the facility operator shall submit a report to the RWQCB prior to the applicable deadline. The report will describe the portion of the SWPPP that is infeasible; provide justification for the requested deadline extension; provide a proposed schedule for completing and implementing compliance for the portion of the SWPPP; and describe the BMPs that will be implemented in the interim period to reduce or prevent pollutants in stormwater discharges. Written notification would be provided to the RWQCB within 14 days of implementing these BMPs. Pick-n-Pull understands that such reports are subject to RWQB approval and/or modifications.

## 6. CERTIFICATION OF SWPPP

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.


_____     Date _5-23-14_

James Smith, Store Manager
Pick-n-Pull Auto Dismantlers
Sacramento Store #10

# APPENDIX 1

Drain Inlet BMP Diagram

Drain inlet protection diagram:



**Overhead View**

- Clean rock filter barrier ¾ clean crush rock
- Staked, Oil Adsorbent Boom
- Staked Straw Wattle, trenched 1" into soil
- Concrete Apron
- Witch's hat/Drain Guard and Oil Pillow/"Pig" inside Drain Inlet



**Cross Section**

- Clean rock filter barrier ¾ clean crush rock
- Staked, Oil Adsorbent Boom
- Staked Straw Wattle, trenched 1" into soil.
- Concrete Apron
- Witch's Hat/Drain Guard
- Storm Water Pipe
- Drain Inlet
- Oil Adsorbent Pillow/"Pig"



**PICK-n-PULL**
*SELF-SERVICE AUTO & TRUCK DISMANTLERS*

## Storm Water BMP's: Proper Protection of Drain Inlets

1) Wherever feasible, Drain Inlets shall be protected as shown in the included diagram. This includes Witch's hat, Oil Pillow, Straw Wattle, Oil Adsorbent Boom, and ¾ crush rock-clean free of fine particles (NOT ABF). Only one exception: In paved areas (where staking and gravel placement is not possible) all drain inlets shall have a "witch's hat/Drain guard and an oil adsorbing pillow/"Pig".

2) Straw Bales may be used in place of Straw Wattles where equipment does not operate.

3) Drain Inlets shall be visually inspected weekly as required in APG BMP's. The Witch's Hats shall be replaced at a minimum monthly during the rainy season or as required after major rain events.

4) Straw Wattles shall be replaced at least once per year or sooner if needed.

5) Oil Booms and Pillows shall be replaced when they are completely oil stained or at a minimum of twice per rain season.

6) Oil booms may be zip-tied to the Drain Inlet Grate as an alternative to staking them to the ground. (see examples next page)

7) Remember, this BMP is a part of your SWPPP. You are obligated to implement this wherever practical.

Drain inlet protection BMP layout examples:

Properly Protected Drain Inlet



Properly Protected Drain Inlet



Straw Wattles

Witch's Hat



Oil Absorbent Booms & Pillows

To order these storm water supplies, log onto
Oracle and go the: Main Store/Shop for Supplies.
Witches Hats=Drain Guards
Wattles=Straw Wattles
Oil Booms= Boom

# APPENDIX 2

StormwaterRx Clara 90C Schematic





## GENERAL NOTES

1. CLARA® BY STORMWATERX - PORTLAND, OREGON - 800-680-3543. (U.S. PATENT NO. 7,892,425)
2. CLARA 40CO SHALL HAVE TREATMENT FLOW CAPACITY OF 540 GPM, A SEDIMENT STORAGE CAPACITY OF 3 CY AND AN OIL/FLOATBLE STORAGE CAPACITY OF 310 US GAL. A 24"x72"x33" COALESCING PLATE PACK WILL PROVIDE ADDITIONAL OIL SEPARATION AND INCREASED REMOVAL CAPACITY.
3. INTERNAL STRUCTURE DIMENSIONS ARE REFERENCE DIMENSIONS. FINAL EXTERIOR DIMENSIONS WILL DEPEND ON STRUCTURAL REQUIREMENTS AND SHOWN ON SHOP DRAWING. LEFT INLET/OUTLET ORIENTATION SHOWN. RIGHT ORIENTATION ALSO AVAILABLE.
4. PRECAST VAULT TO BE CONSTRUCTED IN ACCORDANCE WITH ASTM C857 AND C858. STRUCTURE AND ACCESS COVERS TO MEET AASHTO H-20 LOAD RATING.
5. INLET AND OUTLET PIPING PER EXISTING PIPE OR TO BE SPECIFIED BY STORMWATERX AND PROVIDED BY OWNER\CONTRACTOR. PRECAST VAULT EQUIPPED WITH CORED OPENINGS AT INLET AND OUTLET LOCATIONS.
6. TOP LID, GRADE RINGS AND MANHOLE FRAME & COVERS OPTIONAL FOR ABOVE GROUND CONFIGURATION.



| | | CLARA® 40CO | | | SHEET |
| | | BASIC SEPARATOR | | | |
| www.stormwaterx.com | | STANDARD DETAIL | | | 1 |
| DATE: 7/11/2012 | SCALE: NONE | FILE NAME: SRX-CLARA40CO-DTL | DRAWN: MJW | CHECKED: PMR | 1 OF 1 |

# Basic



## clara®

An industrial separator



| Target Pollutants |
| --- |
| Free oil |
| Metals |
| Floatables |

Clara (klar-uh) is a patented¹ oil-water-grit separator that can be used as stand-alone treatment or in a treatment train configuration. Clara removes dirt, oil and floatables by gravity separation. With the built-in internal high flow bypass, pollutants are trapped in this below ground structure even during excessive runoff events. Clara is recommended when suspended solids are greater than 200 mg/L and oil is greater than 10 mg/L.

| Clara Model | Treatment Rate (gpm) | Sizing Guideline (acres)** | Buried Footprint (feet)* | Sediment Storage (cy) | Oil/Floatable Storage (gal.) |
| --- | --- | --- | --- | --- | --- |
| 25 | 320 | < 2 | 7 x 9 | 1.8 | 185 |
| 40 | 540 | 2 - 5 | 7 x 13 | 3.0 | 310 |
| 70 | 900 | 4 - 8 | 8 x 16 | 5.0 | 510 |
| 90 | 1120 | 5 - 10 | 9 x 17 | 6.4 | 650 |
| 110 | 1400 | 7 - 12 | 11 x 17 | 8.0 | 820 |

*Typical depth range from 9 to 12 feet   **Varies by region

- Traps pollutants within the system
- Removes floatable materials, oil and dirt
- Treatment flow rates of up to 1400 gpm
- Oil storage capacity of up to 820 gallons
- Sediment storage capacity of up to 8 cu. yds.
- Available with integrated pump package for downstream treatment



Optional grate inlet replaces a catch basin

Internal high-flow bypass

Outlet

Inlet

Inlet

Outlet

Oil and dirt removed here.

# APPENDIX 3

StormwaterRx Aquip Stormwater Filtration System Schematics

# Enhanced

# aquip®

An enhanced filtration system

**Target Pollutants**

TSS/turbidity

Metals

BOD/COD

Nutrients

Aquip (uh-kwip) is a patented[1], enhanced media filtration system for industrial stormwater applications. This stormwater treatment BMP removes fine particulates and dissolved pollutants in a simple and easy-to-use configuration. Aquip is typically installed above ground with a single pump station following oil pretreatment.

Aquip is available in several performance levels, each specifically designed for the reduction of stormwater pollutants such as suspended solids, turbidity, heavy metals (including dissolved metals), organics (e.g. BOD and volatile hydrocarbons), and nutrients (e.g. nitrogen and phosphorus). Targeted metals include copper, zinc, iron, lead, aluminum, nickel and cadmium.

| Aquip Model | Treatment Rate (gpm) | Sizing Guideline (acres)* | Footprint (feet) |
|---|---|---|---|
| 10S/P | 5 - 15 | < 0.25 | 3 x 9 |
| 25S | 12 - 40 | 0.25 - 0.5 | 5 x 9 |
| 50S | 25 - 75 | 0.5 - 1 | 7 x 12 |
| 80S | 40 - 120 | 1 - 2 | 7 x 16 |
| 110S | 60 - 170 | 2-3 | 8 x 18 |
| 160S | 80 - 240 | 3-4 | 8 x 27 |
| 210S | 100 - 320 | 4-5 | 8 x 32 |
| 400HF | 200 - 600 | 6 - 10 | 18 x 60 |
| 800HF | 400 - 1200 | 12 - 20 | 30 x 60 |

*Varies by region

- Removes particulates and dissolved pollutants
- Uses passive filtration, no chemicals
- Open top for easy access and operation
- Operates unattended, 24/7
- Gravity flow-through system, no moving parts
- Available configurations include steel (below), high-flow, green (infiltrating) and downspout



Pretreatment chamber

Filtration chamber

Inlet →

Outlet

Forklift pockets allow for unit mobility when system is empty.

Sample port



**Inlet:** Polluted stormwater flows into Aquip via the inlet pipe, then into the pretreatment chamber. In most cases stormwater is pumped to Aquip using a simple float actuated stormwater pump as shown on the following pages. A totalizing flow meter on the system lets owners track the rate and total amount of stormwater treated.

**Pretreatment Chamber:** This chamber is customized to naturally balance the water chemistry and improve the quality of the stormwater prior to the filtration chamber. The pretreatment chamber can be configured to settle coarse solids, remove oil & grease, or with a buffering media for enhanced dissolved metals treatment. A mosquito barrier layer is provided to prevent breeding in the pretreatment chamber.

Buffering is the most common pretreatment option. Aquip uses a passive pH buffering process which accelerates the uptake of alkalinity by the stormwater and conditions it prior to filtration. The buffering process works synchronously with several of Aquip's adsorptive filtration media, adsorbing dissolved metals and creating metal complexes that are more easily removed in the filtration chamber. In natural surface water systems, alkalinity in the soil affects heavy metal solubility in a similar fashion but over a much longer period of time. Because of the low alkalinity common to most stormwater, particularly those from facilities where most of the surface is paved, the pH buffering effect is temporary.

**Inlet Distributor:** Water from the pretreatment chamber flows by gravity into the inlet distributor and is dispersed along the full length of the filter media bed, optimizing the contact area of stormwater with filtration media. Energy dissipation fabric lies beneath the distributor to prevent scouring of the media bed.

**Filtration Chamber:** Layers of inert and adsorptive media filter out stormwater pollutants such as, metals, particulates, oil, organics, and nutrients. The filtration media configuration depends on the treatment objectives. Once filtered through the media bed, clean stormwater flows into the underdrain.

Filter maintenance tools and an external filter bed drain down port are provided with each system that allows facility personnel to perform routine maintenance without the need for special equipment.

**Adjustable Head Control:** Clean stormwater leaving the system passes through the adjustable head controller. This patent-pending device can be adjusted in the field and assures optimal water/filter media contact under a range of operating conditions.

**Emergency Overflow:** This outlet provides a means for stormwater to bypass the filter in case the filter becomes plugged during a rain event. Filter bed plugging should not be a concern for systems that are maintained per StormwateRx LLC recommendations.

**Outlet:** Clean stormwater discharges by gravity from the system through the outlet.

**Outlet Sample Port:** This port provides safe and easy access to system effluent for stormwater compliance sampling.

# Exhibit B

Notification Letter Exhibit B



**U.S. Department of Justice**

Environment and Natural Resources Division

90-1-24-03279

*Law and Policy Section*
*P.O. Box 7415*
*Washington, DC 20044-7415*

*Telephone (202) 514-1442*
*Facsimile (202) 514-4231*

**JUL 1 8 2012**

Drevet John Hunt, Esq.
Layne Karen Friedrich, Esq.
Lawyers for Clean Water, Inc.
1004-A O'Reilly Avenue
San Francisco, CA 94129

Margaret Rosegay, Esq.
Pillsbury Winthrop Shaw Pittman, LLP
50 Fremont Street
San Francisco, CA 94105-2228

Re: <u>California Sportfishing Protection Alliance v. Pick and Pull Auto Dismantling, Inc.</u>
<u>et al.</u>, United States District Court for the Eastern District of California (Sacramento)
No. 2:12-CV-222-KJM-DAD

Dear Counsel:

As required by the Clean Water Act ("CWA"), 33 U.S.C. § 1365(c)(3), Plaintiff's
counsel sent the Attorney General a copy of the Complaint in the above-captioned citizen suit.
Please review the attached document entitled "Notification on Receipt of a Clean Air or Clean
Water Act Citizen Suit Complaint," which contains information that we routinely transmit upon
receipt of such a complaint.

Note that the P.O. Box and accompanying zip code for all citizen suit-related
correspondence has recently changed to:

> Citizen Suit Coordinator
> Environment and Natural Resources Division
> Law and Policy Section
> P.O. Box 7415
> Ben Franklin Station
> Washington, D.C. 20044-7415

Mail sent to the previous address will be forwarded for a limited time, after which it will be
returned to sender. Please update your records accordingly. Note that the P.O. Box address to

Notification Letter Exhibit B

which payments of civil penalty monies should be made has also changed.  (Both new addresses are noted in the attached document.)

The Department of Justice has assigned me to answer questions or otherwise assist the parties in achieving a fair and expeditious resolution of this litigation.  Please feel free to contact me at (202) 307-0930 if you have any questions about citizen enforcement generally or the role of the United States in such cases.

Sincerely,

Kate Bowers, Attorney
United States Department of Justice
Environment and Natural Resources Division
Law and Policy Section
P.O. Box 7415
Washington, D.C.  20044-7415

Attachment

Notification Letter Exhibit B



**U.S. Department of Justice**

Environment and Natural Resources Division

---

*Law and Policy Section*
*P.O. Box 7415*
*Ben Franklin Station*
*Washington, DC 20044-7415*

*Telephone (202) 514-1442*
*Facsimile (202) 514-4231*

**Revised February 2012**

## NOTIFICATION ON RECEIPT OF A CLEAN AIR ACT OR CLEAN WATER ACT CITIZEN SUIT COMPLAINT

The Clean Air Act and Clean Water Act provide for service of a copy of a citizen suit complaint on the Administrator of the Environmental Protection Agency (EPA) and on the Attorney General. 42 U.S.C. § 7604(c)(3); 33 U.S.C. § 1365(c)(3); 40 C.F.R. § 135.4. In cases in which the United States is not a party, the United States Department of Justice, Environment and Natural Resources Division, Law and Policy Section receives such materials on behalf of the Attorney General. Upon receipt of a complaint, the Section's longstanding practice is to respond with a standard letter to the parties with basic information on the role of the United States Department of Justice and EPA under the statute in question. To simplify that process, the Section now formats that letter as a shorter cover letter, accompanied by this attachment.

### A. Resources Available for Citizen Suits

Citizen enforcement actions are an integral component of the Acts' overall enforcement schemes. The United States values the contribution that responsibly-pursued citizen suits make to protecting our nation's air and waters. As discussed below, the United States Department of Justice and EPA play an important role in the citizen suit process by reviewing and commenting on proposed consent judgments. The Department also has some expertise in the resolution of certain common legal and practical issues that may arise in drafting consent judgments in citizen suit actions, and we are pleased to consult with counsel or review early drafts of such documents.

The Office of Enforcement and Compliance Assurance of EPA is also available to assist you. EPA has information available to the public that may be of assistance to the parties in this action, such as the BEN computer model for calculating the economic benefits a defendant may have enjoyed as a result of its non-compliance. EPA also has developed a Supplemental Environmental Project (SEP) Policy, which provides guidance in designing environmentally beneficial projects that may be included in a settlement. Many of these resources are available on EPA's Civil Enforcement webpage: http://www.epa.gov/compliance/civil/index.html. For more information regarding EPA resources, please contact Charlie Garlow at (202) 564-1088 regarding the Clean Air Act or Sherry Milan at (202) 564-2619 regarding the Clean Water Act.

Additionally, the United States participates as amicus curiae in some citizen enforcement actions. Please contact the Department's Law & Policy Section if a legal issue arises in this case that you believe may be of interest to the United States.

- 1 -

**B. Review of Consent Judgments**

1. *45 Day Review Period.* If the parties choose to resolve a citizen suit rather than proceed with litigation, the statutory citizen suit provisions require that any settlement be entered as a consent judgment and that the United States be given at least 45 days to review any proposed consent judgment before its entry by the Court. The United States typically uses the entirety of its 45-day comment period. At the end of that period, the United States files a letter or pleading with the Court stating whether the United States objects to the proposed consent judgment, and providing any comments on the document.

2. *Instruments Subject to Review.* For purposes of the United States' right of review, the term "consent judgment" has a broad meaning, and encompasses all instruments entered with the consent of the parties that have the effect of resolving any portion of the case. For example, a document stipulating to dismissal of a case or any part thereof would be within the scope of this language. Such documents and any associated instruments (even if not submitted to the Court) must be submitted to the United States for review, notwithstanding any provisions purporting to maintain the confidentiality of such materials. Amendments to previously-entered consent judgments must also be submitted to the United States for review before entry by the Court. The Department monitors citizen suit litigation to review compliance with this requirement. Settlements that do not undergo the statutorily-required review process are at risk of being void.

3. *Compliance and Remedies.* In its review, the United States seeks to ensure that the proposed consent judgment complies with the requirements of the relevant statute and is consistent with its purposes. See Local 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 525-26 (1986) (a consent decree should conform with and further the objectives of the law upon which the complaint was based). For example, if the defendant has been out of compliance with statutory or permit requirements, the proposed consent judgment should require the defendant to come into prompt compliance and should include a civil penalty, enforceable remedies, injunctive relief, and/or a SEP payment sufficient to deter future violations, or combinations of the above. Please note that payments denominated as civil penalties must be paid to the United States Treasury and should be sent to Saundra Doyle at the following address:

> Saundra Doyle
> Debt Collection Specialist
> Environment & Natural Resources Division
> Executive Office
> P.O. Box 7611
> Ben Franklin Station
> Washington, D.C. 20044-7611
> (202) 616-3135

4. *Federal/State Law Claims.* In some instances, a plaintiff will incorporate claims under federal environmental law and state tort law into a single complaint. Note that any resolution of such a complaint should distinguish between the relief attributable to the federal and the state claims. Any recovery of money damages should be attributable only to the state-law claims. Recovery of money damages by plaintiffs is not permitted under the Clean Air Act or Clean Water Act

-2-

Notification Letter Exhibit B

(although attorney's fees recoveries are permissible in some circumstances). As a rule, a settlement of this type must specifically provide and identify appropriate relief attributable to the federal-law claims consistent with the objectives of the Clean Air Act or Clean Water Act, and may not exclusively allocate relief to the state-law claims. Appropriate types of relief for federal citizen suit claims are discussed in the preceding paragraph (B.3).

5. *SEP Provisions.* A consent judgment may include payments to third parties to carry out a SEP so long as there is a sufficient nexus between the SEP and the violations contained in the complaint. SEP monies may not be received or administered by plaintiffs, only by third parties. If the consent judgment you are submitting includes a SEP, please provide a detailed description of the SEP and the allocation of SEP monies for the particular project. This will allow the United States to evaluate whether there is a sufficient nexus between the SEP and the alleged violations. For guidance, you may consult EPA's SEP Policy, available at http://www.epa.gov/compliance/civil/seps/index.html. When sending the Department a proposed consent judgment that includes a SEP, please also include a letter from any third-party recipient of SEP funding to the Department of Justice, stating that the SEP recipient 1) has read the proposed consent judgment; 2) will spend any monies it receives under the consent judgment for the purposes specified in the consent judgment; 3) is a 501(c)(3) tax-exempt organization; 4) will not use any money it receives under the consent judgment for lobbying purposes; and 5) will submit to the Court, the United States, and the parties a letter describing how the SEP funds were spent. We additionally request that your letter include a project description detailing how the funds will be utilized. We believe this certification by the SEP recipient helps ensure that the SEP advances the purpose of the Clean Water Act or Clean Air Act and serves the public interest.

6. *Procedures for Lodging Proposed Consent Judgments.* EPA's Clean Water Act regulations set forth procedures for service of proposed citizen suit consent judgments on the Department of Justice and EPA. 40 C.F.R. § 135.5. The regulations also provide a process for lodging such proposed consent judgments with the Court. We draw your attention to these requirements. The regulations state that when a proposed consent judgment is filed or lodged with the Court, "the plaintiff shall notify the court of the statutory requirement that the consent judgment shall not be entered prior to 45 days following receipt by both the Administrator and the Attorney General of a copy of the consent judgment." § 135.5(b)(1). They also provide for the plaintiff to notify the Court of the date on which the Administrator and the Attorney General received copies of the proposed consent judgment, either at the time of lodging or after the proposed consent judgment is lodged. *Id.*

The Department requests that the parties follow a similar approach in Clean Air Act cases. This will ensure that the Court is notified of the applicable statutory review period and can defer entry of the proposed consent judgment until the government's review is complete.

7. *Mailing Address for Service on the Department of Justice.* EPA's Clean Water Act regulations provide for service of a copy of a proposed citizen suit consent judgment on the Attorney General at a specified street address. 40 C.F.R. § 135.5. As a result of new security procedures, mail sent to that address is automatically subjected to special mail handling procedures that may delay its arrival for a month or longer. We therefore request until further notice that any proposed consent judgments served on the Department of Justice be sent to the following address:

Notification Letter Exhibit B

Citizen Suit Coordinator
Environment and Natural Resources Division
Law and Policy Section
P.O. Box 7415
Ben Franklin Station
Washington, DC 20044-7415

The Department will treat this as satisfying the statutory requirement to serve the Attorney General. (The separate procedures appearing in the regulation for service on EPA remain applicable and should also be followed.) If a copy of the consent judgment is sent only to the address listed in the regulations, the Department may not regard the 45-day review period as commencing until the special handling process has been completed. You may also arrange for service of consent judgments by fax or email. Please call the call the main number for the Law & Policy Section at (202) 514-1442 to discuss the process for doing so.

## C. Conclusion

We are pleased at any time to discuss these and other principles related to citizen suit actions. It is our hope that through discussions early in the process of resolving a citizen suit we can provide useful information and help to facilitate the prompt, fair and appropriate disposition of these cases. The United States notes for the record that, notwithstanding such discussions or any other involvement, it is not bound by the resolutions of citizen suit matters. See, e.g., Hathorn v. Lovorn, 457 U.S. 255, 268 n.23 (1982) (Attorney General is not bound by cases to which he was not a party); 28 U.S.C. §§ 516, 519.

- 4 -

Notification Letter Exhibit B